## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI,
## CENTRAL DIVISION

RYAN FERGUSON,                                          )
                                                        )
            *Plaintiff*,                                )
                                                        )
        v.                                              )
                                                        )
JOHN SHORT, Detective – Columbia, Missouri Police       )
Department, in his individual capacity,                 )
                                                        )
JEFF NICHOLS, Detective – Columbia, Missouri Police     )
Department, in his individual capacity,                 )
                                                        )
JEFF WESTBROOK, Detective – Columbia, Missouri          )
Police Department, in his individual capacity,          )
                                                        )
BRYAN LIEBHART, Detective – Columbia, Missouri          )
Police Department, in his individual capacity,          )
                                                        )
LATISHA STROER, Detective – Columbia, Missouri          )    Case No. 2:14-cv-04062-NKL
Police Department, in her individual capacity,          )
                                                        )
LLOYD SIMONS, Detective – Columbia, Missouri            )
Police Department, in his individual capacity,          )    Jury Trial Demanded.
                                                        )
STEPHEN MONTICELLI, Sergeant – Columbia,                )
Missouri Police Department, in his individual capacity, )
                                                        )
RANDY BOEHM, Former Chief of Police – Columbia,         )
Missouri Police Department, in his individual and official )
capacities,                                             )
                                                        )
THE CITY OF COLUMBIA, MISSOURI, a Municipal             )
Corporation,                                            )
                                                        )
WILLIAM HAWS, Investigator – Boone County               )
Prosecuting Attorney's Office, in his individual capacity, )
                                                        )
BEN WHITE, Investigator – Boone County Prosecuting      )
Attorney's Office, in his individual capacity,          )
                                                        )
BOONE COUNTY,                                           )
                                                        )

1

*Defendants.* )
)

_____)

## SECOND AMENDED COMPLAINT AT LAW

NOW COMES Plaintiff, RYAN FERGUSON, by and through his undersigned counsel of record, and complaining of Defendants, JOHN SHORT, JEFF NICHOLS, JEFF WESTBROOK, BRYAN LIEBHART, LATISHA STROER, LLOYD SIMONS, STEPHEN MONTICELLI, RANDY BOEHM, CITY OF COLUMBIA, WILLIAM HAWS, BEN WHITE, and BOONE COUNTY, and states as follows:

### JURISDICTION AND VENUE

1.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); and the Constitution of the United States.  This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the pendent state law claims as codified in 28 U.S.C. § 1367(a).

2.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiff is a citizen of the State of Florida, on information and belief no Defendant is a citizen of the State of Florida, and the amount in controversy exceeds the requisite jurisdictional amount.

3.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district and, on information and belief, at least one Defendant is a resident of this district and all the Defendants reside in the State of Missouri.

### PARTIES

4.     Plaintiff, Ryan Ferguson, is a resident of the State of Florida.

5.     Defendant John Short ("Defendant Short") was at all times relevant herein employed as a police officer in the Columbia Police Department.

2

6. Defendant Jeff Nichols ("Defendant Nichols") was at all times relevant herein employed as a police officer in the Columbia Police Department.

7. Defendant Jeff Westbrook ("Defendant Westbrook") was at all times relevant herein employed as a police officer in the Columbia Police Department.

8. Defendant Bryan Liebhart ("Defendant Liebhart") was at all times relevant herein employed as a police officer in the Columbia Police Department.

9. Defendant Latisha Stroer ("Defendant Stroer") was at all times relevant herein employed as a police officer in the Columbia Police Department.

10. Defendant Lloyd Simons ("Defendant Simons") was at all times relevant herein employed as a police officer in the Columbia Police Department.

11. Defendant Stephen Monticelli ("Defendant Monticelli") was at all times relevant herein employed as a Sergeant in the Columbia Police Department. Defendant Monticelli supervised the individually named Columbia Police Department officers.

12. From 2000 through 2008, Defendant Randy Boehm ("Defendant Boehm") was the Chief of Police for the Columbia Police Department. Defendant Boehm supervised the individually named Columbia Police Department officers during the course of the Heitholt murder investigation. Additionally, Defendant Boehm exercised final policymaking authority for the City of Columbia Police Department.

13. City of Columbia, Missouri, is a municipal corporation organized and existing pursuant to Missouri law. The City of Columbia is in Boone County, Missouri, which is situated within the Western District of Missouri. At all relevant times City of Columbia was the employer of Defendants Short, Nichols, Westbrook, Liebhart, Stroer, Simons, Monticelli, and Boehm (collectively, "the Defendant Officers").

3

14.     The Defendant Officers engaged in the conduct complained of under the color of state law and in the course and scope of their employment as police officers with the City of Columbia.  Each of the Defendant Officers is sued in his or her individual capacity.

15.     The Defendant Officers engaged in the conduct complained of pursuant to the customs and policies of the Columbia Police Department.  Defendant City of Columbia is liable for its customs, policies, and omissions in training that caused the deprivations of Ryan's constitutional rights.

16.     Defendant William Haws ("Defendant Haws") was at all times relevant herein employed by Boone County as an investigator for the Boone County prosecuting attorney's office.

17.     Defendant Ben White ("Defendant White") was at all times relevant herein employed by Boone County as an investigator for the Boone County prosecuting attorney's office.

18.     Defendants Haws and White engaged in the conduct complained of under the color of state law and in the course and scope of their employment as Boone County prosecuting attorney's investigators.  Defendants Haws and White are sued in their individual capacities.

19.     From 1993 to 2006, Kevin Crane ("Prosecutor Crane") was the duly elected prosecuting attorney for Boone County, and exercised final policymaking authority for the Boone County Prosecuting Attorney's Office.

20.     Boone County is a local county government and a political subdivision organized and existing pursuant to Missouri Law.  At all relevant times Boone County was the employer of Prosecutor Crane and Defendants Haws and White.

21.     Defendants Haws and White engaged in the conduct complained of pursuant to

the customs and policies of the Boone County Prosecuting Attorney's Office. Defendant Boone County is responsible for its customs, polices, and omissions in training that caused the deprivation of Ryan's constitutional rights.

## FACTUAL ALLEGATIONS

### The murder of Kent Heitholt

22.     Kent Heitholt ("Heitholt"), a sports editor for the Columbia Daily Tribune, was tragically murdered in the early morning hours of November 1, 2001, in the parking lot of the Tribune next to his car. Heitholt sustained multiple injuries from 11 blunt force blows to his head. His hyoid bone had been fractured. The cause of death was determined to be asphyxia caused by strangulation. A mark around Heitholt's neck matched his belt buckle, which was found on the ground nearby along with part of his belt.

23.     Numerous items of physical evidence were recovered at the scene. Papers were found around and under Heitholt's car. These included a Hickman High School girls' basketball schedule and a number of Columbia College basketball programs and schedules. As sports editor, Heitholt did not cover Hickman High School girls' basketball games.

24.     Heitholt's front driver's side car door was closed when police first arrived at the scene, but they later found blood drops on the inside of the door.

25.     Following the attack, the perpetrator had picked up items from the ground and placed them in the driver's seat of the car, including Heitholt's glasses, as well as a yellow notepad with a transfer blood stain on it. The glasses had a lens broken during the struggle. The lens was discovered under Heitholt's car. A leaf from the ground was with the items on the driver's seat, confirming that the items had been picked up off the ground following the struggle.

26.     Unknown fingerprints were discovered on and in Heitholt's car. Two sets of

5

bloody footwear impressions were located at the scene.

27.     A hair was found in Heitholt's hand which did not match Heitholt and was presumed to have been left by the killer.

28.     Heitholt's keys, watch, and the remainder of his belt were never located.  The killer had left Heitholt's wallet in Heitholt's car.

29.     Shawna Ornt ("Ornt") and Jerry Trump ("Trump"), custodians working at the Tribune the night of the murder, were interviewed by police as possible witnesses.

30.     Ornt told police that at around 2:00 a.m. she saw Heitholt coming down the stairs from the sports area of the newspaper, and they said goodbye to each other.  Heitholt exited the building to the north parking lot.  At 2:21 a.m., Ornt exited the north side of the Tribune building to smoke a cigarette.  At that time she observed a white male duck behind the driver's side door of Heitholt's vehicle.  Ornt went back inside and told Trump what she had seen.  Ornt further told police that when Trump opened the door she heard Trump yelling at whom he believed was Heitholt.  Ornt indicated that two individuals stood up from behind Heitholt's vehicle, and one of them stated, "Somebody's hurt, man."

31.     Ornt told police that she got a "good look" at one of the individuals, who she described as a white male having short, blonde spiky hair, a muscular build, approximately six feet tall and twenty to twenty-one years of age.  Ornt later worked with Defendant Nichols to generate a composite sketch of this individual.

32.     Like Ornt, Trump told police that when the individuals stood up behind Heitholt's vehicle, one of them stated, "Somebody's hurt, man" at which time they began walking through the alley towards Fourth Street.

33.     At the scene, Trump initially told police that the individual by the rear driver's

6

side of the vehicle was a white male with a stocky build, possibly dark hair with a ball cap resting on his head, and approximately six feet tall. Trump stated the other individual appeared to be a white male with short blonde hair, approximately six feet tall, and nineteen to twenty years of age. Later that morning Trump admitted to police that he could not provide a detailed description of either of the individuals.

### *The failure to investigate Michael Boyd*

34.     Disturbingly, the Defendant Officers failed to investigate the prime suspect in the murder of Kent Heitholt, Michael Boyd ("Boyd"). At the time of Heitholt's murder, Boyd was a sports writer for the Tribune. Heitholt was Boyd's supervisor. **Boyd is the last known person to see Heitholt alive, and has consistently placed himself at the scene of the murder when it took place**.

35.     Items found at the scene link Boyd to the murder scene. Numerous papers were found around and under Heitholt's car. These papers include a Hickman High School girls' basketball schedule and a number of Columbia College basketball programs and schedules. Boyd covered high school basketball, including Hickman High, as well as Columbia College basketball. Heitholt did not cover such events. Boyd frequently took "paperwork" home, including team schedules. On the night of the murder, Heitholt was only carrying his laptop bag and had no loose papers in his hands.

36.     Despite his obvious significance to the investigation, Boyd was only interviewed twice by members of the Columbia police department. Boyd was first interviewed at approximately 3:35 a.m. the night of the murder by Defendant Short on the telephone. Boyd was then interviewed at approximately 11:45 p.m. by Defendant Simons.

37.     Boyd gave Defendants Short and Simons conflicting information. Boyd told

7

Defendant Short that he left the Tribune shortly after 2:00 a.m. the night of the murder. Boyd stated that he spoke with Mike Henry, a janitor, for five or ten minutes outside the entrance to the building, then saw Heitholt exit the door. Boyd told Defendant Short he then spoke with Heitholt as both of them stood next to Heitholt's car. Boyd stated that he left the Tribune at 2:20 a.m., and did not see anybody around the parking lot or anybody who was suspicious.

38.     Boyd told Defendant Simons that at 2:10 a.m. he exited the northern door of the Tribune, got into his vehicle and started adjusting his radio. Boyd stated that after a couple of minutes he noticed Heitholt coming out of the back door of the Tribune. Boyd stated he started his car, backed up, headed south towards the Tribune building, rolled down the driver's side window, and spoke to Heitholt while sitting in his car.

39.     Given that Boyd's papers were discovered at the crime scene, given that he was the last known person to see Heitholt alive, given that Boyd left the scene just one minute before Ornt went outside, and given that he gave inconsistent information to the Defendant Officers about his actions that night, the Defendant Officers should have conducted investigation into Boyd as a suspect. They did not do so and, as a result, failed to obtain additional incriminating information.

40.     Due to their failure to investigate, the Defendant Officers never learned that Boyd had a dispute with Heitholt shortly before the murder regarding a "major mistake" he had made on an assignment from Heitholt. Boyd also did not fill out a timesheet indicating when he left the Tribune the night of the murder, even though he was required to do so.

41.     In an interview with defense investigator Jim Miller ("investigator Miller"), Boyd gave yet another rendition of events in addition to that which he gave Defendants Short and Simons. This time Boyd stated he went to his vehicle, listened to a cassette tape, and then saw

8

Heitholt exit the building. Boyd told investigator Miller that he then pulled out, headed towards the building, made a U-turn in the lot, pulled up next to Heitholt, and spoke to him through the passenger's side window. During this interview Boyd also stated that he saw Heitholt get in his car, backup, and start to pull out of the parking lot.

42.     Boyd offered inconsistent information regarding the vehicle he was driving the night of the murder. During his February 14, 2005 interview with investigator Miller, Boyd stated that he was driving his blue Oldsmobile Cutlass Ciera. On July 24, 2005, Boyd told Defendant Haws that he was driving his wife's red Plymouth Acclaim the night of the murder. Boyd had disposed of the blue Oldsmobile in August, 2004.

43.     Due to their failure to investigate, the Defendant Officers never learned that Boyd had, in fact, returned to the crime scene after the murder. The fact that Boyd never told this to any of the Defendant Officers is highly suspicious. Boyd can even be seen in a crime scene photograph, peering out from behind a door towards the location where Heitholt's body was found.

44.     Boyd's return to the scene of the murder is made even more suspicious in light of other statements he has since made. Boyd has admitted that when he arrived home after the murder, he immediately washed his clothes and put on a long-sleeved sweatshirt.

45.     Boyd has stated that he arrived back at the Tribune at approximately 4:15 or 4:30 a.m., and that when he arrived he saw Heitholt's body face down. This is impossible, as Heitholt's body was turned face up when he was discovered by other Tribune employees at approximately 2:25 a.m. The only other individual that knew how Heitholt's body was originally positioned is the killer.

46.     Boyd has also stated that he saw paramedics and a lot of emergency lights at the

9

scene when he arrived. However, the paramedics had left the scene long before 4:15 a.m. In fact, Defendant Nichols was called to the scene at 2:30 a.m., and the paramedics were already gone by the time he arrived.

47.     Months later, after learning that police were looking for two individuals in connection with the murder, Boyd went to the police department and met with Defendant Short.

48.     During that meeting Boyd told Defendant Short that as he left the parking lot the night of the murder at about 2:20 a.m., he saw two individuals walking casually down the alley a "good ways" from the crime scene.

49.     The information disclosed to Defendant Short was critically important for multiple reasons. First, Boyd had previously told both Defendants Short and Simons that he had not seen anybody in the Tribune parking lot. More importantly, in light of Ornt reporting that she had exited the Tribune at 2:21 a.m., Boyd's statements to Short excluded the two white individuals at the scene as having perpetrated the murder.

50.     Boyd has since admitted that he was "worried" when he saw the two individuals in the alley, and at one point he was concerned that they would write down his license plate number.

51.     Despite its obvious importance, Defendant Short never prepared a report containing the information Boyd provided. And, despite the fact that Boyd yet again provided inconsistent, incriminating information to police, the Defendant Officers continued to refrain from investigating him further as a suspect. Defendant Haws interviewed Boyd again after Ryan was charged and tardily disclosed the report from that interview. The report contained a fabricated statement that Boyd said he saw "two white guys." Boyd could not discern the race or gender of the individuals.

10

52.     Collectively, the Defendant Officers never made any effort to locate or process either of Boyd's vehicles for trace evidence, including blood or DNA. The Defendant Officers also never requested DNA or fingerprints from Boyd to compare to the evidence from the crime scene.

### The night of October 31, 2001

53.     In October, 2001, Ryan and Charles Erickson ("Erickson"), were juniors in high school. At that time both Ryan and Erickson were approximately five feet, six inches tall, and weighed less than 150 pounds.

54.     Erickson had been discharged that month from probation for a marijuana charge. At that time he was smoking marijuana three or four times a day. He also frequently snorted Adderall and cocaine, occasionally used LSD or mushrooms, and often drank alcohol to excess.

55.     On the evening of October 31, 2001, Erickson was at a friend's house. Erickson snorted Adderall and had several alcoholic drinks. Later, Erickson and his friends went to a Halloween party at Ryan Swilling's house. Erickson took Adderall orally, snorted Adderall and cocaine, drank from a keg, and played several drinking games at the party. The police showed up and broke up the party, and Erickson left. Erickson was intoxicated by the time he left the Swilling residence.

56.     After Erickson left the party, he and Ryan went to the By George, a bar located in downtown Columbia. Ryan's sister, Kelly, knew a By George employee and was able to get Ryan and Erickson into the bar even though they were underage. While at the bar, Erickson drank more alcohol and became further intoxicated. Ryan and Erickson left the bar shortly before it closed at 1:30 a.m. Ryan dropped Erickson off at his residence and then drove home himself. At no point that evening did Ryan go to the Tribune parking lot.

11

57.     The following morning Erickson could not remember leaving the By George bar. Erickson did not have any blood on his clothes; he did not see any marks or injuries to his body; and Erickson had no belief that he had killed anyone.

### Subsequent investigation and media coverage

58.     The Heitholt homicide and the subsequent investigation were incredibly high profile.  Columbia is a college town with thousands of young college students residing in the community.  The fact that such a brutal murder took place in the heart of Columbia, especially on a night when many college-aged students were celebrating Halloween within walking distance of where the crime took place, horrified the public.  As a result, there was tremendous pressure on the law enforcement community, including all of the Defendants named in this Complaint, to make an arrest for this brutal crime.

59.     The Heitholt murder was investigated by numerous City of Columbia police officers, including Defendants Short, Nichols, Westbrook, Liebhart, Simons, and Stroer. Defendants Monticelli and Boehm supervised and took part in the Columbia Police Department's investigation.  Defendants Haws and White of the Boone County Prosecuting Attorney's office also participated in the investigation

60.     For more than two years no arrests were made in the Heitholt homicide.  Several people contacted the police with information that various individuals made incriminating statements about having been involved in the homicide.  Others contacted the police about people they knew who looked like the composite sketch generated from the description provided by Ornt.  All of the individuals so identified were ruled out as suspects based on a DNA comparison to the hair found in Heitholt's hand at the scene.

61.     The Heitholt homicide was covered extensively in the news and many details

12

regarding the murder were reported in media accounts. It was widely reported that the victim was discovered in a pool of blood near his car at about 2:26 a.m.; that he had sustained blunt-impact head injuries and had defensive wounds on his hands; that the cause of death was strangulation; that janitors saw two white males of college age at the scene; and that a "cleaning lady" had "called for help."

62.     Due to the media coverage of the murder and the lack of any progress in the investigation, the public pressure to have the perpetrator apprehended and brought to justice grew.

### *The two year anniversary of the Heitholt murder*

63.     Erickson's drug and alcohol use increased substantially between 2001 and 2003. Erickson used more and different drugs, and began to experience feelings of paranoia.

64.     In November of 2003, Erickson read an article concerning the two year anniversary of the Heitholt homicide. The article included the composite sketch made by Ornt of one of the individuals seen by Heitholt's vehicle after he was murdered. Erickson thought the composite looked similar to him. Erickson did not recall committing the murder, but became obsessed with the case because he could not remember leaving the By George that night. He continued to read news articles about the case by searching the archives of the Columbia Tribune.

65.     In or around January, 2004, Erickson approached Ryan and informed Ryan he felt he was having "repressed" memories about being involved in the murder. Ryan told Erickson they had no involvement in the murder.

66.     Someone who had overheard the conversation between Erickson and Ryan contacted "Crimestoppers" to report what Erickson had said.

13

67.     Sometime in 2003, Ryan's car had been broken into and stereo equipment had been stolen.  Ryan reported the theft to the Columbia Police Department.  On January 23, 2004, after receipt of the "Crimestoppers" report, Defendant Stroer asked Ryan to come to the Columbia Police Department under the guise of obtaining "elimination prints" relative to that investigation.  Ryan voluntarily provided his fingerprints.

68.     On January 28, 2004, Defendant Nichols sent Ryan's and Erickson's fingerprints to the Missouri State Highway Patrol for comparison to the prints recovered from the Heitholt murder scene.  On January 30, 2004, Defendant Nichols learned that Ryan and Erickson were eliminated from the numerous unidentified fingerprints recovered at the scene.

69.     A few months later, Erickson informed two other friends, Nick Gilpin ("Gilpin") and Art Figueroa ("Figueroa"), about the thoughts he was having.  Erickson told them he felt he could be dreaming the whole scenario.  Gilpin contacted the police regarding what Erickson had told him.

### The Defendant Officers feed Erickson information and details about the murder

70.      At approximately 9:00 a.m. on March 10, 2004, Erickson came to the Columbia Police Department.  At that time, there was no probable cause to believe that he had participated in the Heitholt murder.  The sole information that implicated him was purely speculative rumor.  Erickson did not begin to agree with the officers' false inculpatory statements until well into the interrogations.

71.     When Erickson arrived at the police department, his outward behavior and appearance made clear that he was mentally unstable and under the influence of drugs and/or alcohol.

72.     Defendants Short and Nichols commenced multiple interrogations of Erickson not

14

aimed at finding the truth, but instead designed to obtain false, incriminating statements implicating both Erickson and Ryan in the Heitholt homicide without any regard for their obvious innocence.

73.     During Erickson's interviews, it became immediately apparent that he had no recollection of participating in the murder and there was no probable cause for his arrest. Erickson repeatedly told Defendants Short and Nichols that his memories were "foggy," "dream-like," and were based on assumptions he made after reading newspaper articles about the murder.

74.     Erickson also consistently gave information that was inaccurate with the evidence recovered from the crime scene.

75.     Desperate to make an arrest, Defendants Short and Nichols provided Erickson information and details about the murder.

76.     After Erickson told Defendant Short that he struck the victim one time, Defendant Short told Erickson that the victim was hit more than once and that there were "multiple, multiple, multiple contusions and strikes" on Heitholt's head.

77.     Defendant Short also told Erickson with what Heitholt had been strangled. After Erickson guessed that the victim had been strangled with a shirt or bungee cord, Defendant Short told Erickson that Heitholt's belt had been ripped off his pants and that he was strangled by his own belt.

78.     Defendant Short also told Erickson that Heitholt's keys and watch were missing.

79.     Defendant Short further told Erickson that one of the two individuals by Heitholt's car told "the cleaning lady to get help."

80.     Defendant Nichols drove Erickson around downtown Columbia. After Erickson told Defendant Nichols that he could not remember where the murder took place, Defendant

15

Nichols drove him to the Tribune parking lot and pointed out the exact spot in which Heitholt's car had been parked.

81.     When Erickson persisted in denying any memories of the murder, Defendant Nichols told Erickson that his "hind end is the one hanging over the edge" and that "it's you that's on this chopping block."

82.     Given no other options by Defendant Nichols, Erickson's will was overborne and he agreed with the story he had been fed by Defendant Officers.

83.     Defendants Short and Nichols coerced Erickson's statements: they had reason to know Erickson was mentally unstable and under the influence of drugs; they interrogated him for hours, they never left him alone; they interrogated him without any friend, relative, attorney, or advisor present; they falsely claimed they had strong incriminating evidence; they promised leniency if he confessed and said he would be found guilty and "on the chopping block" if he did not; they used threatening tones and language; they refused to accept Erickson's repeated and credible statements that he had no memory of the night; and they used leading questions or blatantly provided details about the crime.

84.     Erickson's statements were worthless.   Erickson had not disclosed any information to police that was not previously disclosed through the media or through Defendants Short and Nichols during the interrogations.  Erickson also gave information to Defendants Short and Nichols that they knew was clearly wrong, including the fact that he and Ryan had returned to By George after the murder.   It is undisputed that By George closed at 1:30 a.m., approximately 45 minutes before the murder took place.

85.     As a result, Defendants Short and Nichols knew, or should have known, that Erickson and Ryan were innocent of the Heitholt murder.

### *Defendants fabricate corroboration of Erickson's statements*

86.     The Defendant Officers knew that Erickson's statements, in and of themselves, were fabricated so they proceeded to fabricate more evidence to corroborate the false story they fed to him.

87.     At 10:00 a.m. on March 10, 2004, Columbia Police Officers James Harmon ("Harmon") and Tim Giger ("Giger") took Dallas Mallory ("Mallory") into custody.  After establishing that Mallory was familiar with Erickson by appearance, Harmon told Mallory that Erickson claimed he had spoken with Mallory shortly after the murder.  Mallory denied going to the By George, and continually denied seeing Erickson.

88.     Harmon asked Mallory if he would be willing to submit to a truth verification examination, and Mallory stated he was willing to do so.  Harmon then contacted Defendant Westbrook to conduct a computer voice stress analysis.

89.     Defendant Westbrook prepared a report reflecting his interview with Mallory.  In the report, Defendant Westbrook indicated that Mallory again denied speaking with either Erickson or Ryan the night of the murder.

90.     Defendant Westbrook's report further states that he administered a voice stress analysis to Mallory, asking questions as to whether he knew who had killed Heitholt and if he suspected anyone of perpetrating the murder.  Defendant Westbrook's report states that he advised Mallory that Mallory failed the test.

91.     According to Defendant Westbrook's report, Mallory then told him that Mallory did have contact with Erickson and Ryan the night of the murder, and that Erickson had told him he had "beat someone down."  Per the report, Mallory stated that Erickson had something in his hand, but he could not remember what.

92.    On September 14, 2004, Defendants Liebhart and Westbrook re-interviewed Mallory at the Columbia Police Department.  Defendant Liebhart drafted a report reflecting the interview.

93.    According to Defendant Liebhart's report, Mallory repeated what he had told Defendant Westbrook during the March 10, 2004 interview.

94.    Per Defendant Liebhart's report, Mallory stated he had attended a party at the Blue Note club in downtown Columbia the night of the murder.  The report further indicates that after the Blue Note closed, Mallory could not say exactly where but that he remembered seeing Erickson.  According to the report, Mallory stated that Erickson was "figity [*sic*] and pushy," saying something about a "fight."

95.    According to Defendant Liebhart's report, he reminded Mallory that Mallory had originally reported that Erickson told Mallory, "we beat someone down."  Per the report, Mallory agreed that was the statement he heard Erickson make.

96.    The statements attributed to Mallory in Defendant Westbrook's and Defendant Liebhart's reports are total fabrications.  Specifically, Mallory never told either Defendant that he saw Erickson after leaving the Blue Note; that Erickson was "figity and pushy"; or that Erickson said "something about a fight" or "we beat someone down."

97.    Mallory did not see Erickson after he left the Blue Note, nor did Erickson tell him that he and Ryan had beat somebody down.

98.    Contrary to Defendant Westbrook's report, several officers, including Defendants Westbrook, Liebhart, Short, and possibly other officers, coercively interviewed Mallory after he was detained on March 10.

99.    During that interview, Mallory was placed in a small interview room.  After he

18

denied seeing Erickson the night of the murder, several officers, including Defendants Westbrook, Liebhart, and Short, screamed at him. They called him a liar, told him he knew information and that he was not telling them the truth. Mallory began to cry and told them he wanted to leave. Defendants Westbrook, Liebhart, and Short told him he could not leave until he told the truth. They also refused to let Mallory eat and refused to let him use a phone. Defendants Westbrook, Liebhart, and Short also threatened to put a hold on Mallory's car, or even charge him with the murder, unless he went along with their version of events.

100.    Of course, Defendants Westbrook, Liebhart, and Short did not video record their interrogation tactics, despite the fact that Mallory was in custody and allegedly a crucial witness offering corroboration of Erickson's version of events.

101.    Defendants Westbrook and Liebhart deliberately fabricated reports indicating that Mallory told them he saw Erickson the night of the murder and that Erickson said "we beat someone down" to corroborate information from Erickson's interviews.

102.    Defendant Short, among others, knew that the reports were false because he participated in the coercive interrogation of Mallory during which Mallory denied speaking with Erickson the night of the murder.

103.    Defendants Monticelli and Boehm approved and/or ratified the coercive tactics used against Mallory. Defendants Monticelli and Boehm also were aware that the reports reflecting the interviews of Mallory were false, and approved and/or ratified the fabrications.

104.    The Defendant Officers failed to disclose the interrogation tactics they used against Mallory to either the prosecution or defense, and further failed to disclose that Mallory continuously denied having seen Erickson or Ryan after the murder took place.

105.    Mallory's denials of having seen Erickson the night of the murder is further proof

19

that the Defendant Officers knew or should have known of Ryan's and Erickson's innocence.

### *Ryan is arrested and charged based on the fabricated evidence*

106.    Ryan was arrested on March 10, 2004, based on the fabricated evidence.

107.    At that time, the evidence overwhelmingly established Ryan's and Erickson's innocence, all of which was ignored by the Defendant Officers.

108.    None of the forensic evidence found at the scene matched Ryan. Ryan and Erickson were both excluded as having left the hair found in Heitholt's hand. This is the same DNA testing that was used to eliminate all of the other potential suspects. None of the many unidentified fingerprints found at the scene matched either Ryan or Erickson. The bloody footwear impressions found next to the victim's body also did not match any of Ryan's or Erickson's shoes.

109.    The descriptions given by Ornt and Trump at the scene did not even come close to matching Ryan's and Erickson's appearance on November 1, 2001. Both Ornt and Trump described the individuals standing by Heitholt's vehicle as being close to six feet tall, at least one of whom was stocky with a muscular build, and approximating nineteen to twenty-one years of age. Ryan and Erickson both stood approximately five feet, six inches tall, weighed less than 150 pounds, and were seventeen years old.

110.    Having reached a decision to fabricate a case against Ryan despite his innocence, Defendants Short and Nichols did not present Ryan and Erickson to Shawna Ornt in a lineup. Ornt was the only person to have had a good look at either individual standing by Heitholt's vehicle the night he was murdered. Had Defendants shown Ornt a lineup, she would have confirmed that neither Ryan nor Erickson was the individual she saw in the Tribune parking lot. Defendants did not show a lineup to Ornt because they knew she would eliminate Ryan and

Erickson as having been present at the scene of the murder.

111.    Defendants Monticelli and Boehm were aware of and approved and/or ratified the decision to not present Ryan or Erickson to Ornt in a lineup.

112.    The Defendant Officers therefore decided to fabricate additional evidence to induce Erickson to plead guilty.

### *Meghan Arthur*

113.    On March 11, 2004, Meghan Arthur ("Arthur") went to the Columbia Police Department.  She was interviewed by Defendant Stroer.  Arthur went to the police department because she believed in Ryan's innocence based on conversations she had overheard and taken part in.

114.    Defendant Stroer, however, deliberately misquoted Arthur and misrepresented what Arthur told her.  Defendant Stroer's intent was to make it appear that Ryan had made incriminating admissions about the murder when in fact he had not.

115.    Defendant Stroer's report indicates that Arthur told her she had a "disturbing" conversation in October 2003.  Per the report, Arthur was at a small party at John Cole and Ryan's residence.  Ryan was present.  According to the report, Ryan was "really drunk and she believed high on narcotics."  Defendant Stroer indicated that Arthur told her Ryan was "uppity and jittery" and she felt he was high on cocaine.

116.    Per Defendant Stroer's report, Ryan and Arthur had a conversation in Ryan's bedroom.  Ryan allegedly told Arthur that "he and Erickson had done something stupid." According to Defendant Stroer, Arthur stated Ryan told her "Erickson is trying to pull him into this, and that he [Ryan] didn't want to turn himself in." The report states that Arthur became upset because Ryan was scaring her.

21

117.    Defendant Stroer's report is a fabrication.  Arthur never described having a "disturbing" conversation with Ryan; she never told Defendant Stroer that Ryan appeared to be high on narcotics; Arthur never stated that Ryan told her "he and Erickson had done something stupid"; and Arthur never made it seem like Ryan was trying to avoid apprehension for something he had done wrong.

118.    Defendant Stroer's report further indicates that Arthur told her she saw Ryan at a New Year's Eve party.  Per the report, Erickson was at the party for a brief period of time.  After Erickson left, Ryan and Allison Cooper ("Cooper") went into another room to have a private conversation.  According to Defendant Stroer's report, when Cooper came out of the room she "looked pretty upset."  Arthur purportedly told Defendant Stroer "she believes that [Ryan] might have said something to [Cooper] about the Heitholt incident because Cooper seemed very upset." The report reflects that Arthur, Cooper, and several other friends left to go to another party, and that Cooper "wouldn't tell anyone about what her and [Ryan] were talking about."

119.     Arthur had no reason to believe at the time of the New Year's Eve party that Ryan and Cooper had talked about the Heitholt murder.  Arthur also never told Defendant Stroer that Cooper was "very upset" and refused to discuss with her friends what she and Ryan were talking about.

120.    The other Defendant Officers, including Defendants Monticelli and Boehm, were aware that the report reflecting the interview of Arthur was false, and approved and/or ratified the fabrications in an effort to induce Erickson to plead guilty.

### Richard Walker

121.    As of April 6, 2004, Richard Walker ("Walker") was an inmate at the Boone County Jail in the same cellblock as Ryan.  Walker was in custody on kidnapping and bank

robbery charges from Callaway County.

122.     On that date, jail officials received information that Walker was in possession of two metal shanks and that he and another inmate had planned an escape.  Jail officials recovered the shanks.  Walker initially denied owning the shanks.  Following an investigation, Walker admitted to possessing the shanks but claimed making the shanks was not his idea.

123.     Jail officials recommended that Walker be reclassified as a "high escape risk" and that two correctional officers escort Walker anytime he was removed from his cell.  Walker was also placed in disciplinary segregation.

124.     The following day, Walker, desperate to improve his situation at the jail and hopeful of receiving help on his pending charges, notified jail officials that he had information regarding Ryan.  Jail officials passed this information along to Defendant Monticelli.

125.     Prior to speaking with Walker, the Defendant Officers met with each other and reached an agreement to use Walker to fabricate evidence against Ryan, just as they had with other witnesses.  It was decided that Defendants Stroer and Liebhart would meet with Walker first and discuss the case with him.  The plan was then to have Walker make a videotaped statement, falsely detailing admissions made by Ryan about having been involved in the murder.

126.     On April 8, 2004, Defendants Stroer and Liebhart met with Walker at the Boone County Sheriff's Office.  During that meeting, Walker told Defendants Stroer and Liebhart that he would say anything they wanted him to say.  Defendants Stroer and Liebhart discussed the Heitholt case with him, relating information about the murder and statements made by Erickson. They then rehearsed with Walker what they wanted him to say during the videotaped interview.

127.     Defendant Stroer, as she had done with Arthur, then fabricated a report reflecting what Walker had supposedly told her.

128.    In the report, Defendant Stroer indicates that Walker told them that he did not want anything in exchange for the information he had regarding Ryan.

129.    The report states that Ryan began speaking with Walker when he first arrived at the Boone County Jail.  Per the report, Ryan told Walker that he and Erickson left the bar around 1:15 or 1:30 a.m., got into Ryan's car, and then decided they were going to rob "a drunk college kid" coming out of the bar.  According to the report, Ryan told Walker that he and Erickson were drunk and "messed up on the drug 'Ecstacy.'"

130.    The report indicates that Ryan told Walker that he and Erickson saw Heitholt and decided to "Trick or Treat" (rob) him.  Per the report, Ryan and Erickson parked by the Tribune and got in the trunk to get a tire tool.  Ryan allegedly told Walker that he had two tire tools in his trunk.  Defendant Stroer reported that Ryan told Walker "he could not get to one of the tire tools which was with his spare tire because of a pair of 12" speakers in the trunk and the other tire tool was laying loosely in his trunk."

131.    The report further states:  "[Ryan] stated he and [Erickson] approached Heitholt and [Erickson] hit Heitholt.  [Ryan] stated he felt that Heitholt could identify them so [Ryan] struck him with the tire tool.  [Ryan] stated it happened so quickly.  [Ryan] stated he and [Erickson] got back in the car and he took [Erickson] home."

132.    The report is a complete fabrication.  Ryan never made these statements to Walker, and Walker could not have made these statements to Defendants Stroer and Liebhart because he knew nothing about the case.  Instead, Defendants Stroer and Liebhart provided Walker with information they had learned from the investigation, and rehearsed with Walker what they wanted him to say while being videotaped.

133.    The following day, on April 9, 2004, Defendant Stroer met with Walker at the

Boone County Sheriff's Office to obtain a videotaped statement. Defendant Stroer again rehearsed with Walker what he would say prior to the recording. Walker then gave a videotaped statement, attributing false statements to Ryan.

134. Like Defendant Stroer's report, the videotaped statement is a total fabrication. Due to his pending charges and status in disciplinary segregation, Walker was vulnerable and willing to do anything to improve his situation. Walker had told Defendants Stroer and Liebhart that he would say whatever they wanted him to say. Walker had no information about the case apart from what Stroer and Liebhart told him. Defendants Stroer and Liebhart knew the information provided by Walker was false.

135. On information and belief, Defendants Stroer and Liebhart also told Walker that they would try to get him out of disciplinary segregation in exchange for the false evidence he was to provide against Ryan.

136. On April 17, 2004, Walker sent Defendant Liebhart a letter. On information and belief, the letter was destroyed by Defendant Liebhart. Defendant Liebhart drafted a report regarding his receipt of the letter, but the letter was not disclosed to the prosecutors or Ryan's attorney.

137. On June 13, 2004, Walker sent Defendant Liebhart another letter. On information and belief, the letter was destroyed by Defendant Liebhart. The letter was not disclosed to the prosecutors or Ryan's attorney. Defendant Liebhart failed to draft a report regarding his receipt of the letter.

138. On June 18, 2004, Walker sent Defendant Liebhart another letter. On information and belief, the letter was destroyed by Defendant Liebhart. The letter was not disclosed to the prosecutors or Ryan's attorney. Defendant Liebhart failed to draft a report regarding his receipt

of the letter.

139.    On information and belief, on June 24, 2004, Defendants Stroer, Liebhart, and/or other officers from the Columbia Police Department visited Walker at the Boone County Jail. The visit was not documented in any police report, and the content of that meeting was never disclosed to the prosecutors or Ryan's attorney.  Following the visit, Walker was moved to a different cell so he could watch television.

140.    On June 29, 2004, Walker sent Defendant Liebhart another letter.  On information and belief, the letter was destroyed by Defendant Liebhart.  The letter was not disclosed to the prosecutors or Ryan's attorney.  Defendant Liebhart failed to draft a report regarding his receipt of the letter.

141.    On July 7, 2004, Walker sent Defendant Liebhart another letter.  On information and belief, the letter was destroyed by Defendant Liebhart.  The letter was not disclosed to the prosecutors or Ryan's attorney.  Defendant Liebhart failed to draft a report regarding his receipt of the letter.

142.    Defendant Liebhart failed to properly preserve written communications with a potentially crucial witness for the prosecution.  The only possible explanation for his failure to do so is that the letters from Walker evidenced the fabrication of Defendant Stroer's report and the videotaped statement given by Walker, and/or contained evidence impeaching Walker's statements to police.

### The fabricated evidence was used to induce Erickson to enter a plea and falsely testify against Ryan

143.    Even with the videotaped statement of Walker, Defendants knew that the only way the case could continue against Ryan was to convince Erickson to enter a plea in exchange for testimony against Ryan.

26

144. In an effort to convince Erickson to enter a plea, the Defendant Officers met and collectively decided to tender the fabricated police reports from the Heitholt investigation to Erickson.

145. Erickson, who never had any memory of events after leaving the By George bar in the early morning hours of November 1, 2001, reviewed Defendants Westbrook's and Liebhart's reports of their interviews with Mallory. The reports, as described above, falsely indicated that Mallory saw Erickson in downtown Columbia after the murder, and that Erickson had told Mallory that he and Ryan had "beat a guy down."

146. The Defendant Officers also gave Erickson Defendant Stroer's report of her interview with Arthur. That report, as described above, falsely quoted Ryan as stating that "he and Erickson had done something stupid" and that Ryan "didn't want to turn himself in."

147. The Defendant Officers also provided Erickson with the false report regarding Walker's statements to Defendants Stroer and Liebhart. Based on the report, Erickson was led to believe that Ryan had made admissions of guilt to Walker while in the Boone County Jail.

148. Erickson believed that a first degree murder charge carried a possible sentence of execution. While Erickson only faced second degree charges, he knew that he could be indicted with first degree murder charges in the event that Ryan took a plea and testified against him.

149. Erickson regularly received news articles while he was in jail. In an article published in the Columbia Daily Tribune, March 13, 2004, Prosecutor Crane, the prosecuting attorney, is quoted as saying his decision whether to seek death against Ryan on the first degree murder charge was "unresolved." Prosecutor Crane was also cited in televised news stories as having not made a decision whether to seek the death penalty. Erickson was made aware of these reports while in the jail.

150.    At the Defendant Officers' direction,Walker spoke with Erickson at the jail after meeting with the Defendant Officers on June 24, 2004.  The Defendant Officers told Walker to tell Erickson that Ryan would do whatever he needed to place the blame for the murder on Erickson, and told him that Ryan was going to take a plea.  Walker related this information to Erickson.

151.    This information was false.  Ryan never had any intentions of pleading guilty to something he did not do.

152.    The Defendant Officers also told Erickson that Trump, the janitor who admitted to police that he could not give a detailed description of the individuals by Heitholt's car the night of the murder, was going to identify Erickson and Ryan as the individuals he saw.

153.    Fearing a possible death or life sentence if he went to trial, the fabricated evidence induced Erickson to enter a plea in exchange for his false testimony against Ryan.

### Erickson's proffer agreement

154.    On October 1, 2004, Erickson met with Defendants Short and Liebhart, and Prosecutor Crane pursuant to a proffer agreement.  Erickson agreed to enter a plea based upon the fabricated story created and provided to him by the Defendant Officers.

155.    Defendants never provided Erickson with information refuting his and Ryan's involvement in the murder.  For example, Erickson was never told that his version of events did not explain the forensic findings.  Erickson was never told that Mallory denied seeing Erickson and Ryan after the murder.  Because the Defendant Officers did not present Ryan and Erickson in a lineup to Ornt, Erickson was never told that Ornt would rule him and Ryan out as being the two individuals she saw by Heitholt's vehicle.  The Defendant Officers also never told Erickson that every witness they spoke with confirmed that the By George had closed at 1:30 a.m.,

approximately 45 minutes before the murder took place. Erickson was not shown the results of memory testing performed on him at the University of Missouri in 2001 showing he had an impaired memory perhaps from his drug and alcohol use.

156. The Defendant Officers never told Erickson that Trump could not identify him and Ryan; that Arthur's police reports were false; or that Ryan was not going to enter a guilty plea and testify against him. Erickson was never told about the extensive evidence pointing to Boyd, and how the timeline he provided excluded the two white individuals at the scene as having committed the murder.

### *Defendant Haws contacts Jerry Trump*

157. As of the date of the murder, Trump was on parole for the felony of endangering the welfare of a child. In December 2001 Trump violated the conditions of his parole and was sent to the penitentiary.

158. Prior to his incarceration, Trump had made several statements, including statements to police, that he would not be able to identify the individuals he saw by Heitholt's car the night of the murder.

159. At some point prior to his release on December 13, 2004, Trump was placed in a private room at the prison. At that time he received a phone call from Defendant Haws. During that conversation Defendant Haws told Trump that they had arrested the perpetrators, and needed Trump to identify them as the individuals he saw by Heitholt's car the night of the murder. Trump agreed because he feared further prosecution on uncharged allegations against him.

160. At trial, Ryan's attorney sought to suppress Trump's expected in-court identification and requested a hearing to ascertain the circumstances of his apparent out-of-court identification based on newspaper photos. Unaware of Haws' discussion with Trump,

Prosecutor Crane represented to the Court that Trump had contacted the State and there was no evidence of "state action," which was required to warrant a hearing. The Court accepted this representation and denied the request for the hearing. Had Defendant Haws disclosed his phone conversation to the defense, the hearing would have been granted, and the identification would have been suppressed.

### The Defendant Officers suppress additional exculpatory evidence

161. Knowing that the case against Ryan was a house of cards, the Defendant Officers, Defendant Haws, and Defendant White systematically suppressed evidence favorable to Ryan from Erickson, defense attorneys and from the prosecution.

### Kim Bennett

162. Kim Bennett ("Bennett") was interviewed by police during the course of the investigation. On information and belief, Defendant Short and one or more of the Defendant Officers interviewed Bennett.

163. Bennett told Defendant Short that on October 31, 2001, she and her friend Amanda went to the By George to see another friend, Bernard, who was DJ-ing at the bar. Bennett knew Ryan, and had spoken with him at the By George.

164. Bennett further told Defendant Short that at approximately 1:00 a.m. the bar began to close. She and Amanda went out to the parking lot to wait for Bernard to pack up his supplies. At approximately 1:30 a.m., as Bennett and Amanda were standing in the parking lot, she saw Ryan and Erickson walk by. Ryan said something along the lines of "see ya," and he and Erickson continued walking to Ryan's car.

165. Bennett told Defendant Short that she saw Ryan and Erickson get into Ryan's car. At no time did they open Ryan's trunk. She witnessed them drive away.

30

166.    Bennett's testimony was material and exculpatory, because it would have undermined Erickson's testimony and the prosecution's theory as to how the crime took place.

### Kristopher Canada

167.    Prior to Ryan's trial, Kristopher Canada ("Canada") was interviewed by Defendant White.

168.    Canada told Defendant White that he was a bartender at the By George, and was working on Halloween night, 2001.

169.    Canada informed Defendant White that the lights came on at the By George at 1:15 a.m., and that the bar closed at 1:30 a.m.  Canada told Defendant White everyone was out by 1:30 a.m. and the doors were locked.  Canada told Defendant White that the bar always closed by 1:30 a.m.

170.    This information was important for impeachment purposes because Erickson's testimony that he and Ryan left the bar, went straight to Ryan's car, and then directly to the Tribune is irreconcilable with the fact that the latest they could have left the bar was 1:30 a.m. Walking this route would have taken approximately 6 minutes.  The attack took place at approximately 2:15 a.m.  Evidence that the bar closed 45 minutes before the attack leaves a substantial amount of time unaccounted for in Erickson's testimony.

171.    The information also undermined the basis for Erickson's plea and his testimony that he and Ryan had returned to the By George after the attack, because the bar would have been closed for close to an hour.

172.    Prosecutor Crane did not ask Defendant White to interview Canada.  Defendant White was acting in a purely investigatory capacity at the time he interviewed Canada.

### *Melissa Griggs*

173.     Prior to Ryan's trial, Melissa Griggs ("Griggs") was interviewed by Defendant Haws.

174.     Griggs informed Defendant Haws that she was at the By George Halloween night, 2001.

175.     Griggs told Defendant Haws that she saw Erickson at the By George and spoke with him.  She also told Defendant Haws that the bar closed at 1:30 a.m.

176.     This information was important for the same reason that the information provided by Canada to Defendant White was important.

177.     Prosecutor Crane did not ask Defendant Haws to interview Griggs.  Defendant Haws was acting in a purely investigatory capacity at the time he interviewed Griggs.

### *Barbara Trump*

178.     The prosecution claimed Trump received a newspaper article from his wife, Barbara Trump ("Mrs. Trump"), while he was in prison.  The article contained photographs of Ryan and Erickson and served as the basis for Trump's identification of them as the individuals he saw by Heitholt's car.

179.     Prior to trial, Defendant Haws interviewed Mrs. Trump.  During that interview Haws asked Mrs. Trump if she had sent an article to her husband about the Heitholt case while he was in prison.  Mrs. Trump told Defendant Haws she did not recall sending the article.

180.     Defendant Haws never drafted a report reflecting his interview with Mrs. Trump, including the fact that she had no recollection of having sent the article.  As a result, Defendant Haws never disclosed the information provided by Mrs. Trump to either the prosecution or the defense.

32

181. This information was exculpatory and material for a myriad of reasons, including but not limited to the fact that it undermined the putative basis for Trump's identification of Ryan.

182. Prosecutor Crane did not ask Defendant Haws to interview Mrs. Trump. Prosecutor Crane was not aware that Defendant Haws had interviewed Mrs. Trump, nor was he aware of the information she provided. Defendant Haws was acting in a purely investigatory capacity at the time he interviewed Mrs. Trump.

### Ryan was wrongfully convicted

183. Ryan was tried by a jury. The prosecution did not call Mallory, Arthur, or Walker to testify at trial. The prosecution also did not call Boyd, despite the fact that he was the last known person to see Heitholt alive.

184. Notwithstanding the fact that Ornt worked with police to develop a composite sketch, the prosecution did not ask Ornt if she could identify Ryan or Erickson as being one of the individuals standing by Heitholt's car the night he was murdered.

185. The prosecution's case was based entirely on the fact that Erickson took a plea for 25 years to testify against Ryan, and the identification of Ryan made by Jerry Trump.

186. On October 21, 2005, Ryan was found guilty by a jury of one count of second degree murder and one count of first degree robbery. He was sentenced to a total of 40 years incarceration. His conviction was affirmed on direct appeal.

187. Ryan subsequently filed a Rule 29.15 motion for post-conviction relief. The circuit court denied relief after an evidentiary hearing. The decision to deny relief was affirmed on appeal.

188. For years Ryan languished in a prison cell, not knowing whether he would spend

33

the majority of his life incarcerated for a crime he did not commit.

### Ryan's conviction unravels after years of incarceration

189.    On February 14, 2011, Ryan filed a petition for writ of habeas corpus with the Circuit Court of Cole County.  The petition was based in part on affidavits from Trump and Erickson admitting that that they had committed perjury at Ryan's trial.  A hearing was held on the petition.

190.    Trump testified that he had lied when he identified Ryan as being a person by Heitholt's vehicle the night of the murder.  Trump testified that he was unable to make out the individual features of either of the two individuals and would not have been able to identify them.

191.    Trump also revealed, for the first time, that his first contact with Defendant Haws was before his release from prison, not after he was released as he had represented at trial. Trump testified that he agreed with Haws to identify Ryan because he feared that he would be charged with additional crimes.

192.    Defendant Haws also testified at the hearing.  Defendant Haws testified that after discussions with Trump, he interviewed Mrs. Trump.  At that time Mrs. Trump told Defendant Haws she had no memory of sending Trump the article with Ryan's and Erickson's photographs. Defendant Haws admitted that this information was never disclosed to the defense because he never drafted a report reflecting the interview.

193.     Erickson testified to his extensive alcohol and drug consumption on October 31, 2001.  Erickson admitted to being heavily intoxicated by the time he and Ryan arrived at the By George.  Erickson had more to drink at the bar, and had no memory of leaving the By George or going home that night.

34

194. Erickson testified that while in jail, he was given the police reports and discovery from his case. This included the fabricated reports of the Defendant Officers regarding interviews with Mallory, Arthur, and Walker. Erickson further testified that he spoke with Walker, who told him that Ryan would try to "put the crime" on Erickson, and that he was told Trump would identify him as having been at the scene.

195. Erickson was induced by the false evidence and false information fabricated by the various Defendants to accept a plea agreement to avoid a possible first degree murder charge, life in prison, and possible execution. Pursuant to his plea agreement Erickson testified against Ryan.

196. Erickson admitted that his trial testimony that he remembered participating in the murder with Ryan was completely false and that his false guilty plea was induced by fabricated evidence.

### *The Western District grants Ryan relief, and the charges against him are dismissed*

197. On November 5, 2013, the Missouri Court of Appeals, Western District, granted Ryan's petition for writ of habeas corpus and vacated his conviction.

198. In its opinion, the Western District noted that Defendant Haws failed to prepare written reports following several witness interviews conducted in Ryan's case. Specifically, the Court held that Defendant Haws failed to disclose his interview of Mrs. Trump and the content of that interview to Ryan. The Western District held that not only had Defendant Haws withheld this information from Ryan, but also from the prosecution.

199. The Western District also emphasized that disclosure of the interview with Mrs. Trump could have been used by Ryan's defense attorney to further investigate Trump's sudden, triggered ability to identify Ryan and Erickson, possibly even leading to Trump's recantation of

the identification prior to Ryan's trial.

200.    In any event, Defendant Haws' failure to disclose the interview with Mrs. Trump deprived Ryan of significant evidence that would have aided his ability to impeach Trump's identification as suggested or coerced.

201.    Thus, Ryan was "prejudiced" by Defendant Haws' failure to disclose the content of his interview with Mrs. Trump.  Defendant Haws' actions violated Ryan's constitutional right to a fair trial.

202.    Moreover, the Western District also assessed the materiality of the Mrs. Trump interview by considering the cumulative effect of all the undisclosed evidence.  Specifically, the Court held:

> Our review of the record reveals a pattern of nondisclosures, each of which bears the trademark possessed by the Barbara Trump interview – a witness interview by Haws for which no written report was generated. . . . The habeas record reflects at least three other examples of material information possessed by the State that was never affirmatively or timely disclosed.  In each case, Ferguson ended up discovering the information prior to or during trial through his own devices.  But Ferguson did not independently discover the information until long after the State was bound to disclose the information.

203.    As a specific example, the Western District cited the State's failure to disclose information Defendant Haws obtained from Griggs.  The Western District held that without a written report, Ryan had no knowledge before trial of the favorable interview with Griggs. "Though Ferguson discovered this information during trial, the impact of his late discovery of the exculpatory testimony is difficult to discount."

204.    The Western District cited as a further example the failure to disclose to Ryan that Ornt could not make an identification of him or Erickson after seeing their photographs.  Again, Defendant Haws did not draft a report reflecting this information, which was therefore never

36

turned over to the defense.

205.     Additionally, the Western District chastised the State for failing to timely disclose the revelation from Trump that he was able to identify Ryan and Erickson as the men he saw in the parking lot on the night of Heitholt's murder, or that the identification was triggered by the receipt of a newspaper from Mrs. Trump.  Once again, Defendant Haws failed to draft a report regarding the information Trump provided.

206.     The Western District concluded:

> The additional undisclosed but plainly material statements that were late discovered by Ferguson demonstrates that the undisclosed Barbara Trump interview and the undisclosed prison contact with Trump that her interview might have permitted Ferguson to discover, were not isolated incidents.   We cannot overlook the cumulative impression these nondisclosures create.  We have already concluded that the undisclosed Barbara Trump interview was material, without regard to the additional nondisclosures.  Any doubt on that point, however, would be resolved in favor of materiality in light of our cumulative consideration of all of the favorable evidence the State possessed, but failed to disclose.

207.     Based on the constitutional violation, the Western District vacated Ryan's convictions.

208.     On November 12, 2013, the proceedings terminated in Ryan's favor when the Attorney General elected to dismiss the charges against Ryan.

### Damages

209.     As a result of the Defendants' unconstitutional conduct, Ryan spent 3,533 days incarcerated for a crime he did not commit.  Ryan was deprived of economic opportunities and suffered economic harm.   Even more so, Ryan endured incalculable mental anguish and emotional pain and suffered separation from his family and friends and lived in an environment where any day he could have been beaten, sexually assaulted, or even murdered.  While Ryan was locked away, many of his friends graduated from college, got married, had children, and/or

37

embarked on new professional careers. Rather than sharing in these experiences and living a life of his own, Ryan languished in a prison cell not knowing if he would have to spend the majority of his remaining life behind prison walls.

210. Ryan's damages include, but are not limited to, past and future pecuniary losses, emotional distress, mental anguish, humiliation, loss of reputation, loss of liberty, loss of enjoyment of life, loss of consortium, and other non-pecuniary losses.

## COUNT I

## 42 U.S.C. § 1983

### - Destruction and/or Suppression of Exculpatory Evidence -
### (14th Amendment – Procedural Due Process)

### (Against Defendant Officers and Defendant Haws)

211. Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

212. As more fully set forth above, throughout the investigation Defendant Haws and the Defendant Officers concealed exculpatory and impeaching evidence in violation of Ryan's fundamental right to due process. This includes but is not limited to the suppressed evidence as described below.

213. Defendant Haws, acting in his investigatory capacity, failed to disclose to either the prosecution or the defense his interview of Mrs. Trump, wherein Mrs. Trump told him she had no recollection of having sent a newspaper article to her husband concerning the Heitholt murder.

214. Defendant Haws, acting in his investigatory capacity, failed to disclose to either the defense or the prosecution his first contact and conversation with Trump, which occurred

38

while Trump was incarcerated.

215.    Defendant Short failed to disclose to either the prosecution or the defense his interview with Boyd, wherein Boyd stated that as he left the parking lot the night of the murder at about 2:20 a.m., he saw two individuals, whose race or gender he could not discern, walking casually down the alley a "good ways" from the crime scene.

216.    Defendant Short failed to disclose to either the prosecution or the defense his interview with Bennett, wherein Bennett informed him that she saw Ryan and Erickson leave the By George at approximately 1:30 a.m., get into Ryan's car, and drive away.

217.    Defendant Liebhart destroyed and/or failed to disclose to either the prosecution or the defense the numerous letters he received from Walker. Defendants Stroer and Liebhart also failed to disclose to either the prosecution or the defense their visit with Walker at the Boone County Jail on June 24, 2004.

218.    Defendants Liebhart, Westbrook, and Short failed to disclose to either the prosecution or the defense the coercive interview tactics employed against Dallas Mallory.

219.    Defendants Monticelli and Boehm were aware of and deliberately indifferent to, and/or approved of, the suppression of evidence described in this Count on the part of the Defendant Officers.

220.    Each of the foregoing pieces of evidence, individually and collectively, was favorable and material to Ryan. This evidence was suppressed by each of the named Defendants in bad faith, and with the intent to deprive Ryan of a fair trial.

221.    The acts and/or omissions described herein violated Ryan's right to procedural due process and his Sixth Amendment right to a fair trial.

222.    The acts and/or omissions of each of the Defendants named in this Count were the

legal and proximate cause of Ryan's injuries as described herein.

**COUNT II**

**42 U.S.C. § 1983**

**- Fabrication of Evidence -**
**(14th Amendment – Substantive Due Process)**

**(Against Defendant Officers)**

223.    Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

224.    As more fully set forth above, throughout the investigation the Defendant Officers fabricated evidence, including Erickson's false confession and the reports of interviews with Mallory, Arthur, and Walker.  The Defendant Officers also participated in the fabrication of the videotaped interview of Walker.

225.    The Defendant Officers used the fabricated reports and videotaped interview to induce Erickson's false guilty plea and false testimony implicating Ryan in the Heitholt murder.

226.    The Defendant Officers continued their investigation of Ryan despite the fact that they knew, or should have known, that Ryan was innocent based on the lack of any credible evidence implicating him in the murder.

227.    The Defendant Officers also used investigative techniques that were so coercive and abusive that they knew or should known that those techniques would yield false information.

228.    As supervisors of the Defendant Officers, Defendants Monticelli and Boehm were deliberately indifferent to, and/or approved of, the fabrication of evidence described in this Count.

229.    The acts and/or omissions of the Defendant Officers described herein were

committed with deliberate indifference to Plaintiff's constitutional rights.

230.    The acts and/or omissions described herein violated Ryan's right to substantive due process.

231.    The fabrication of evidence described in this Count resulted in the continuation of proceedings against Ryan, and induced Erickson to take a plea to a crime he did not commit in exchange for his testimony against Ryan.

232.    The acts and/or omissions of each of the Defendants named in this Count were the legal and proximate cause of Ryan's injuries as described herein.


## COUNT III

### 42 U.S.C. § 1983

**- Reckless or Intentional Failure to Investigate -**
**(14th Amendment – Substantive Due Process)**

**(Against Defendant Officers and Defendants Haws and White)**

233.    Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

234.    As more fully set forth above, throughout the investigation Defendants Haws, White, and the Defendant Officers recklessly and/or intentionally failed to conduct an investigation that would have led to the real murderer of Heitholt and eliminated Ryan and Erickson as suspects.

235.    The Defendants named in this Count coerced and fabricated Erickson's and other witnesses' statements, purposefully ignored evidence establishing Ryan's innocence, and applied systemic pressure to witnesses to implicate Ryan in the face of contrary evidence.

236.    This includes, but is not limited to, the Defendants' failure to investigate Boyd as

41

a potential suspect despite extensive evidence of his guilt; the failure to present Ryan and Erickson in a lineup to Ornt; the Officers' coercion of Mallory and Walker to support statements fabricated by Defendants Short and Nichols attributed to Erickson; and the Defendants' repeated acts of ignoring DNA, fingerprint, and other physical evidence that absolutely excluded Erickson and Ryan as the killers.

237.     The acts and/or omissions described herein were committed with deliberate indifference to Plaintiff's constitutional rights.

238.     The acts and/or omissions described herein violated Ryan's right to substantive due process.

239.     The failure to investigate described in this Count caused the continued prosecution of Ryan despite his obvious innocence.

240.     The acts and/or omissions of each of the Defendants named in this Count were the legal and proximate cause of Ryan's injuries as described herein.

## COUNT IV

### Missouri State Law

### - Malicious Prosecution –

### (Against the Defendant Officers and Defendants Haws and White)

241.     Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

242.     As more fully set forth above, Defendants Haws, White, and the Defendant Officers willfully, unlawfully, and maliciously caused the commencement and/or continuation of a baseless prosecution against Ryan without probable cause, and, as a result of this prosecution,

42

Plaintiff suffered significant damages.

243.     As more fully set forth above, the proceedings terminated in Ryan's favor on November 12, 2013 when the Attorney General elected to dismiss the charges against Ryan, following the Missouri Court of Appeals ruling vacating Ryan's conviction.

244.     The acts and/or omissions of each of the Defendants named in this Count were the legal and proximate cause of Ryan's injuries as described herein.


COUNT V

42 U.S.C. § 1983

- Conspiracy to Deprive Constitutional Rights -

(Against the Defendant Officers and Defendants Haws and White)

245.     Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

246.     As more fully set forth above, throughout the investigation Defendants Haws, White, and the Defendant Officers conspired to suppress favorable, material evidence from Ryan.

247.     The Defendants conducted multiple meetings throughout the investigation to discuss the case.

248.     As more fully set forth above, throughout the investigation the Defendant Officers conspired to fabricate evidence against Ryan when they knew, or should have known, that he was innocent.

249.     As more fully set forth above, throughout the investigation, Defendants Haws, White, and the Defendant Officers conspired to recklessly and/or intentionally fail to conduct

investigation that would have established Ryan's innocence of the Heitholt murder.

250.     As more fully set forth above, throughout the investigation, Defendants Haws, White, and the Defendant Officers conspired to cause the commencement and/or continuation of a baseless prosecution against Ryan without probable cause.

251.     As more fully set forth above and in the preceding Counts, at least one of the Defendants named in this Count engaged in an overt act in furtherance of the conspiracies.

252.     The acts and/or omissions described herein were committed with deliberate indifference to Plaintiff's constitutional rights.

253.     The acts and/or omissions described herein induced Erickson to take a plea and testify against Ryan.

254.     The acts and/or omissions described herein caused the continued prosecution of Ryan despite his obvious innocence.

255.     The acts and/or omissions of each of the Defendants named in this Count were the legal and proximate cause of Ryan's injuries as described herein.

**COUNT VI**

**42 U.S.C. § 1983**

*- Monell -*

**(14th Amendment – Procedural/Substantive Due Process)**

**(Against Defendants City of Columbia and Boone County)**

256.     Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

257.     Defendant Boehm, as Chief of Police, had final policymaking authority for the City of Columbia regarding the customs, rules, practices, and policies that govern the

44

investigators and officers in the Columbia Police Department, including the Defendant Officers.

258.     Prosecutor Crane, as the Prosecuting Attorney of Boone County, had final policymaking authority for Boone County regarding the customs, rules, policies, and practices that govern the investigators of the Boone County Prosecuting Attorney's Office, including Defendants Haws and White.

259.     Defendants City of Columbia and Boone County, through Defendant Boehm and Prosecutor Crane, adopted policies, practices, and customs which operated to deprive Ryan of his constitutional rights.

260.     Defendants City of Columbia and Boone County are accountable under 42 U.S.C. § 1983 because they intended to and did encourage, endorse, and/or reward their agents and employees for violating the constitutional rights of Ryan and other similarly situated persons.

261.     The unconstitutional policies and practices include, but are not limited to:

> a.     a policy, practice, and custom of suppressing, destroying or otherwise secreting exculpatory evidence, including interviews with key witnesses providing potentially impeaching or exculpatory information, from the defense and limiting the defense access to such meaningful evidence;
>
> b.     a policy, practice, and custom of fabricating evidence, including reports, witness statements, and confessions;
>
> c.     a policy, practice, and custom of using interrogation techniques which had a great likelihood of obtaining false and unreliable information from suspects and witnesses;
>
> d.     a policy, practice, and custom of intentionally failing to investigate potential leads that would uncover exculpatory evidence as to an accused

and/or develop inculpatory evidence against those other than the accused;

    e.      a policy, practice, and custom of using false, unreliable "jailhouse snitches" to bolster a case lacking in evidence;

    f.      a policy, practice, and custom of failing to properly train and supervise officers and prosecuting attorneys' office investigators in the techniques and procedures of reliably investigating serious offenses and preserving exculpatory evidence;

    g.      a policy, practice, and custom of failing to discipline officers who violate the Constitution or law or otherwise transgress the rights of criminal suspects during their investigations; and,

    h.      a policy, practice, and custom of being deliberately indifferent to the violation by law enforcement officers of the constitutional rights of the accused.

262.    The policies, practices, and customs described in this Count were adopted prior to the commencement of Ryan's investigation and with deliberate indifference to Ryan's constitutional rights and the rights of those similarly situated.

263.    Defendants City of Columbia and Boone County are accountable under 42 U.S.C. § 1983 also because they, through Defendant Boehm and Prosecutor Crane, were deliberately indifferent to an obvious need to train the Defendant Officers and Defendants Haws and White, respectively, to avoid constitutional violations arising from the utilization of improper and coercive interview techniques on witnesses and suspects, the failure to document and disclose interviews with key witnesses providing potentially exculpatory and impeachment evidence (i.e., *Brady* violations), and the practice of deliberately ignoring leads and evidence that could lead to

46

an individual's exoneration.

264.    The Defendants named in this Count were on actual or constructive notice that there were omissions in their training programs, causing their employees to violate citizens' constitutional rights, due to the pattern of constitutional violations arising from the utilization of improper and coercive interview techniques on witnesses and suspects, the failure to document and disclose interviews with witnesses disclosing potentially exculpatory and impeachment evidence (i.e., *Brady* violations), and the practice of deliberately ignoring leads and evidence that could lead to an individual's exoneration.

265.    The Defendants named in this Count disregarded the obvious need for training on these matters and continued to retain and adhere to the constitutionally deficient training programs.  This continued retention and adherence to constitutionally deficient training programs despite an obvious need for training was carried out with a deliberate indifference to the rights of Ryan and those similarly situated.

266.    The acts and/or omissions of each of the Defendants named in this Count were the legal and proximate cause of Ryan's injuries as described herein.

**COUNT VII**

**Missouri State Law**

**- False Arrest -**

**(Against the Defendant Officers)**

267.    Ryan hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

268.    The Defendant Officers, acting in concert with each other, did willfully and unlawfully under color of legal authority, illegally arrest and/or cause the illegal arrest of

47

Plaintiff and detained him against his will without due and legal process, and with a lack of probable cause.

269.    The Defendant Officers' conduct was the legal and proximate cause of Ryan's damages as described herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court will:

a.    assume jurisdiction of this cause to determine this controversy and case for hearing on the merits;

b.    award compensatory and actual damages to Plaintiff, and against the Defendants, jointly and severally, in the amount of $75,000,000.00;

c.    award punitive damages to Plaintiff, and against the Defendants, jointly and severally, in the amount of $25,000,000.00;

d.    award to Plaintiff his costs and attorney fees, pre-judgment interest, post-judgment interest, all other damages allowed by law, and such other and further relief the Court deems just and proper.

### JURY DEMAND

Plaintiff demands trial by jury as to all issues so triable under Federal Rule of Civil Procedure 38(b).

Respectfully submitted,


/s/ Samuel Henderson                      /s/ Kathleen T. Zellner
Samuel Henderson, Missouri Bar #56330     Kathleen T. Zellner
2015 Bredell Avenue                       Admitted *pro hac vice*
St. Louis, MO  63143                      Kathleen T. Zellner & Associates, P.C.
Ph:  (314) 755-9798                       1901 Butterfield Road, Suite 650

48

Email:  henderas85@hotmail.com

Downers Grove, Illinois  60515
Ph:  (630) 955-1212
Email:  kathleen.zellner@gmail.com

/s/ Douglas H. Johnson
Admitted *pro hac vice*
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois  60515
Ph:  (630) 955-1212
Email:  dhjohnson43@aol.com

49

<u>**Certificate of Service**</u>

       I hereby certify that on **August 27, 2014**, I electronically filed the foregoing **Second Amended Complaint at Law** with the Clerk of the Court to be served via operation of the Court's electronic filing system, which will send electronic notification of the filing on the same days to all attorneys of record as follows:

<u>**On behalf of the Defendant Officers:**</u>
Bradley C. Letterman
Christopher P. Rackers
Schreimann, Rackers, Francka & Blunt
931 Wildwood Drive, Suite 201
Jefferson City, MO  65109

<u>**On behalf of Defendant Boehm**</u>
David S. Baker
(see above for address)

Bruce Farmer
Robert J. Buckley
Oliver Walker Wilson LLC
401 Locust Street, Suite 406
Columbia, MO  65205

<u>**On behalf of Defendants White & Boone County:**</u>
Cynthia M. Juedemann
Michael B. Maguire
Russel F. Watters
Brown & James, PC
800 Market Street, Suite 1100
St. Louis MO 63101

<u>**On behalf of Defendants City and Monticelli:**</u>
David S. Baker
Fisher, Patterson, Sayler & Smith
51 Corporate Woods, Suite 300
Overland Park, KS  66210

<u>**On behalf of Defendant Haws:**</u>
Marshall V. Wilson
Michael G. Berry
200 E. High Street, Suite 300
P.O. Box 1606
Jefferson City, MO  65102

<u>**On behalf of Defendant Crane:**</u>
B. Daniel Simon, III
Marjorie M. Lewis
Robert C. Colbert
Brown, Willbrand, Simon, Powell & Lewis, PC
601 E. Broadway, Suite 203
P.O. Box 1304
Columbia, MO  65205

Respectfully submitted,


/s/ Kathleen T. Zellner
Kathleen T. Zellner
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(Ph) 630-955-1212
Email: kathleen.zellner@gmail.com