# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

RYAN FERGUSON,            )
                                    )
            Plaintiff,           )
                                    )
        v.                   )
                                    )    No. 2:14-cv-04062-NKL
JOHN SHORT, et al.,         )
                                    )
            Defendants.      )

## ORDER

Pending before the Court is Defendants' motion for summary judgment, Doc 201. For the reasons set forth below, Defendants' motion is granted in part and denied in part. Summary judgment is granted for Defendants on Ferguson's Count I, procedural due process. Summary judgment is also granted for Defendants on Ferguson's Count II, substantive due process – fabrication of evidence, to the extent that Ferguson's argument relates to the Richard Walker evidence set out in Part II.B.2.c. Summary judgment is denied on the remainder of Ferguson's Count II and the entirety of Counts III, IV, V, and VII.

## I.     Undisputed Facts

This case arose out of the 2001 murder of Kent Heitholt, a sports editor for the Columbia Daily Tribune ("Tribune"). In 2004, Plaintiff Ryan Ferguson was convicted of the murder and sentenced to forty years in prison. Seven years later, the Missouri Court of Appeals vacated his sentence due to a *Brady* violation. Subsequently, Ferguson filed

1

this lawsuit alleging that Defendant Officers John Short, Jeff Nichols, Jeff Westbrook, Bryan Liebhart, Latisha Stroer, and Lloyd Simons violated his constitutional rights in investigating and prosecuting him for the Heitholt murder.

**A. Murder of Kent Heitholt**

Kent Heitholt was murdered in the parking lot of the Tribune on November 1, 2001. [Doc. 140, p. 5]. At approximately 2:26 that morning, the Columbia Police Department received a 911 call from Jerry Trump, the manager for the Tribune's cleaning crew, which included the following conversation:

| | |
|---|---|
| Male: | I saw two guys in the area |
| Operator: | Were they white or black? |
| Male: | White. I'd say 19, 20. |
| Operator: | What were they wearing? |
| Male: | I, I don't know. This gal, if I can get her to calm down, she could give a report probably to the police a little bit. |
| Operator: | Okay. |
| Male: | Because she saw them she walked out. |
| Operator: | Okay. |
| Male: | To smoke a cigarette saw them duck down behind the car. |
| Operator: | Okay. |
| Male: | I looked out and saw 'em and I said "what's going on" and I knew it was Kent's car and I said "Kent" and they didn't look up nobody did anything. |
| [Indiscernible] | |
| Male: | Somebody's been hurt man. |
| Operator: | Okay so you saw them duck down behind his car? |
| Male: | Yeah. Well somebody's been hurt. |
| Operator: | Okay. |
| Male: | He left here, they said, 15, tw--, er what'd they say, 30 minutes ago. I mean left the building. |
| Operator: | Okay. Okay and then where did they go after that? |

| Male: | I don't know. Up, up towards the new building. Up towards Fourth Street. I guess it's Fourth. Towards the front of the Tribune building. |
| | *** |
| Male: | No. You, ye-- Yeah it would have been east and I would say south. I would say south east. But I don't know that for sure because they took off. You know, they went up that alley way towards Fourth. |
| Operator: | Okay, okay. Alright. We've got officers on the way over there right now. |
| Male: | Alright we will be out there. |
| Operator: | Okay. |
| Male: | Bye. |
| Operator: | Do--. |

[Ex. E].

Officer Shanona McGeorge was dispatched to the scene and upon arrival observed Heitholt lying on the ground next to a vehicle in the Tribune parking lot. [Ex. A, at OFFICERS000009-000016]. Robert Thompson, a sports writer for the Tribune, informed McGeorge that the computer system at the Tribune cut off at 2:00 a.m. *Id.* Thompson last saw Heitholt at approximately 2:10 a.m. *Id.* Sometime later, a maintenance worker approached Thompson to inform him that someone was outside hurt and lying in a pool of blood. *Id.* Thompson went outside and after seeing Heitholt lying face down on the concrete, turned him over and checked his pulse. *Id.*

Officer Baxley was also dispatched to the scene, and once there spoke with Trump and Shawna Ornt, a member of the Tribune's overnight maintenance staff. [Ex. A, at OFFICERS000017-000020]. Trump informed Baxley that he and Ornt had been at work at the Tribune that night. *Id.* After Ornt went outside to smoke a cigarette, she returned and said she saw individuals in the parking lot by a car. *Id.* Trump went to investigate,

3

raised the dock door, and saw an individual by the rear tire of Heitholt's vehicle. *Id.*

Trump initially believed the individual was Heitholt. *Id.* He later observed that the

individual was an approximately six-foot tall, twenty or twenty-one year old, white male

with a stocky build, possibly dark hair and a ball cap. *Id.* Trump observed a second

individual stand up around the driver's side door. *Id.* This person was also a white male,

had blonde hair, was approximately six feet tall, had a thin build, and was nineteen or

twenty years old. *Id.* One of the individuals by the car said "somebody's hurt, man," and

both began walking briskly east through an alleyway towards Fourth Street. *Id.*

Ornt informed Baxley that at approximately 2:00 a.m., Heitholt spoke with her

briefly before he left the Tribune building. *Id.* At approximately 2:20 a.m., Ornt left the

north side of the Tribune building and walked into the parking lot. *Id.* She saw a white

male duck behind the driver's side door of a car in the parking lot and she became

frightened, so she returned to the Tribune building and relayed what she had seen to

Trump. *Id.* Trump opened the door and called out to Heitholt. *Id.* The individual on the

driver's side of the vehicle stood up and one of the individuals said "somebody's hurt,

man." *Id.* Ornt observed that one of the individuals had short, spiky, blonde hair, a

muscular build which was not bulky, was approximately six feet tall, was twenty to

twenty-one years old, and was wearing a light gray shirt. *Id.* The second individual was

a white male, possibly with dark hair. *Id.* The individuals began walking briskly east

toward Fourth Street through the alley located on the north side of the Tribune building.

*Id.* After relaying these statements both Ornt and Trump were taken to the Columbia

Police Department for further interviews. *Id.*

Upon reaching the Columbia Police Department, Ornt completed a composite with a detective. *Id.* at OFFICERS000021-000022. The composite showed a white male with blonde hair flipped up at the front with a detective. *Id.* She was "not as satisfied as [she] wanted to be" with the first composite sketch. [Ex. B, at FERGUSON003343 (Doc. 208-1, p. 16)]. Ornt and Trump reiterated to the officers at the Police Department the descriptions of the night's events conveyed at the scene.

### B. Investigation of Murder

On November 1, 2001, Stephen Monticelli was the Sergeant in charge of the Major Crimes Unit for the Columbia Police Department. [Ex. HHH, at ¶ 3 (Doc. 214-5, p. 1)]. Officer Short was the lead detective in the Heitholt murder. [Ex. 1, p. 17 (Doc. 234-1, p. 17)]. To investigate the murder, the Columbia Police Department used a "lead card system" to generate and assign leads to individual investigators for follow up. [Ex. HHH, at ¶¶ 4-5 (Doc. 214-5, p. 1)]. Existing leads could generate further leads. *Id.* The purpose of this system was to prevent duplication of work, make the investigation more efficient and provide an organized system during complex investigations. *Id.*

Defendant Detectives Jeff Westbrook, Lloyd Simons, Bryan Liebhart, John Short, and Jeff Nichols were all involved in the initial investigation into the murder. After being contacted at approximately 2:30 a.m. on November 1, Nichols processed the scene for physical evidence and learned that the victim was Heitholt. [Ex. A, OFFICERS000278-000287]. There was a large amount of blood and blood spatter located throughout the scene, a belt buckle (apparently torn from Heitholt's belt) was lying near Heitholt's head, and Heitholt's neck displayed red marks that were consistent with ligature marks. *Id.*

5

Nichols noted that Heitholt's pants were very bloody and the saturation on the right leg suggested that Heitholt may have knelt down at one point. *Id.* There were also several basketball schedules, a lens from a pair of glasses, and a cell phone scattered around Heitholt's car and a pile of cat food on top of a wall near the parking lot. *Id.* at OFFICERS000280. Nichols recovered fingernail scrapings and strands of hair from Heitholt's hands during the autopsy of the body. *Id.* at OFFICERS000278-000287.

On November 1, Detective Short spoke with Michael Boyd, a sports writer who worked for Heitholt, over the phone and learned that Boyd had left the Tribune building shortly after 2:00 a.m. that morning. [Ex. A, OFFICERS000072-000074]. Boyd saw Heitholt leaving the Tribune building and talked with him at his car. *Id.* They discussed a stray cat that had been clawing at Heitholt's tire, and Boyd went to his vehicle and drove off around 2:20 a.m. *Id.* Later that day, Detective Simons spoke with Boyd at the Tribune and learned that Boyd walked to his car at approximately 2:10 a.m. and saw a black and gray cat in the parking lot. *Id.* at OFFICERS000095-000097. Boyd sat in his car in the parking lot for a couple of minutes adjusting his radio, and saw Heitholt come out of the Tribune building. *Id.* Boyd drove his vehicle up to Heitholt and talked with him for a few minutes about Boyd's car, the cat, and needing help operating a laptop for work. *Id.* Boyd said that he left the parking lot between 2:15 and 2:20 a.m.

On November 2, Detective Simons conducted a follow up interview with Ornt. [Ex. A, OFFICERS000133-000136]. Ornt reported that the individual near the back bumper of the car was a white male, twenty to twenty-two years old, tall, muscular, and had blonde hair that was short on the sides, laid down flat on top and flipped up near the

forehead. *Id.* She stated that the individual was wearing a tighter style shirt which somewhat showed his muscular build. *Id.* The individual was lighter skinned and gave Ornt the impression that he lifted weights and had been out partying. *Id.* The second individual was approximately the same age, shorter, and had a fatter build than the first individual. *Id.* Ornt noted that the hair in the composite was not exactly correct. *Id.* at OFFICERS000136. A follow up interview was also conducted with Trump, who stated that the individual near the rear fender of the vehicle was a white male, possibly twenty, had dark hair, and was wearing a cap. *Id.* at OFFICERS000137-000141. Trump stated that the second individual was a white male in his early twenties with a thinner face than the first individual. *Id.* Trump was unable to assist in the preparation of the composite sketches. *Id.* He was not certain if he could identify the individuals again. *Id.*

The Columbia Police Department was unable to locate the two individuals suspected of murdering Heitholt. The Missouri State Highway Patrol Crime Lab ("Lab") tested Heitholt's fingernail scrapings for DNA, but was unable to identify any readable profiles other than Heitholt's. [Ex. CCC, at ¶ 6 (Doc. 211-6, p. 2)]. If Heitholt had scratched his attackers, a mixed profile would likely have resulted from the profiling. *Id.* The Lab also performed multiple DNA tests on blood obtained from Heitholt's sweater, pants, belt, and shoes, none of which matched anyone other than Heitholt. *Id.* at ¶ 9. Numerous "no value" or "non-usable" fingerprints were obtained on items tested at the Lab. [Ex. EEE, at ¶ 6 (Doc. 212-4, p. 1)]. However, there were numerous latex prints from unknown individuals inside of Heitholt's car which did not match Ferguson, Erickson, Heitholt, or any known individual. [Ex. B, at FERGUSON003784 (Doc. 209-

7

1, p. 22)]. All usable prints were located on parts of the car unassociated with the attack on Heitholt. *Id.* at FERGUSON003770-003772.

In February 2003, after receiving training at FBI headquarters in Quantico, Virginia, Detective Nichols contacted Ornt to re-interview her and create a revised composite sketch of one of the suspects. [Ex. A, at OFFICERS000769-000772; Ex. EE, at p. 13, 212 (Doc. 212-3, p. 13, 212)]. Ornt described the individual near the rear tire as having a rectangular head that was longer than average, a square chin that was wider than average, eyes that were closer together than average, a nose that was narrow at the base, small lips that were wider than average, ears that protruded outward at the top but with ear lobes that were close set to his head, and blonde hair that was combed forward and flipped up in the front. [Ex. A, at OFFICERS000769-000772; Ex. EE, at p. 13, 212 (Doc. 212-3, p. 13, 212)].

From November 1, 2001, through March 10, 2004, numerous newspaper articles were published concerning the Heitholt murder. [Ex. VV, at FERGUSON00883-00917 (Doc. 221-1, p. 1-35)]. None of the articles contained information about Ornt and Trump hearing one of the suspects speak or what was said, though one article did note that the janitors addressed the two individuals at the scene. *Id.* An informational video was released prior to March 10, 2004, which included the 911 call in which Trump said that one of the males at the scene stated "somebody is hurt here, man." [Ex. 4; Ex. 1, at p. 18 (Doc. 234-1, p. 18)].

**C. Officers' Investigation Beginning March 10, 2004**

On March 10, 2004, Officer Baxley was dispatched to speak with an individual who stated he had information related to the murder of Kent Heitholt. [Ex. A, at OFFICERS000821-000826]. Jonathan Alder told Baxley that he had learned that Charles Erickson and Ryan Ferguson were responsible for the Heitholt murder. *Id.* Alder stated that Erickson and Ferguson had been at By George the night of the murder and that Ferguson had been trying to obtain more money. *Id.* According to Alder, when Ferguson saw Heitholt and decided to rob him, an altercation occurred and Ferguson killed Heitholt by strangling him. *Id.* Alder said that he learned this information from Nickolas Gilpin, who had purportedly heard it from Erickson. *Id.* Alder was afraid of Ferguson as Ferguson had been taking steroids and was "unpredictable." *Id.* Alder stated that Ferguson had threatened to kill Erickson and other individuals. *Id.* at OFFICERS000825. Ferguson denies the truthfulness of Alder's statements and disputes Alder's credibility. [Doc. 234, p. 32-37].

Officer Baxley transported Alder, Gilpin, Laura Myers, Aaron Dover, and Chad Hilgeford to the Columbia Police Department for further interviews. *Id.* According to Short's report of his interview with Gilpin, Gilpin stated that Erickson told him that Ferguson had strangled Heitholt to death. *Id.* at OFFICERS000870-000873. Gilpin explained that Erickson said that he and Ferguson were at the By George nightclub on Halloween 2001 when they ran out of money. *Id.* Erickson then told him that the pair left By George because Ferguson wanted to rob someone to get more money. *Id.* Gilpin said that Erickson told him that he watched Ferguson strangle Heitholt in the parking lot of the Tribune. [Ex. A, OFFICERS000870-000873; Ex. Y, at p. 132-135 (Doc. 221-6, p.

9

132-35); Ex. X, at p. 18-19, 27 (Doc. 221-4, p. 18-19, 27)]. According to Short's report, Erickson also told Gilpin that he saw a cleaning lady at the back of the Tribune and yelled at her that someone needed help. [Ex. A, OFFICERS000870-000873; Ex. Y, at p. 132-135 (Doc. 221-6, p. 132-35); Ex. X, at p. 18-19, 27 (Doc. 221-4, p. 18-19, 27)]. Gilpin did not mention this statement during his deposition prior to Ferguson's criminal trial. [Ex. X]. Dover, Hilgeford, and Myers repeated substantially similar stories to the police. Ferguson disputes the credibility of the detectives and the witnesses, but does not disagree that the reports of the interviews contain the foregoing statements. Following these interviews, Erickson was brought to the Columbia Police Department to be interviewed. [Ex. A, at OFFICERS000892-000899].

### 1. Charles Erickson Interviews

At 9:00 a.m. on March 10, 2004, Officer Bryan Piester picked up Charles Erickson from the Moberly Area Community College in Columbia, Missouri, and transported him to the Columbia Police Department. [Ex. A, at OFFICERS000859-000861; Ex. SS, at p. 32]. Short interviewed Erickson twice on March 10; the first interview was not recorded, but the second was. [Ex. DDD, at ¶ 6 (Doc. 212-2, p. 1)]. The initial interview began at approximately 9:22 a.m. and lasted for approximately thirty to forty-five minutes. *Id.* at ¶ 7. The second interview lasted from approximately 10:05 a.m. to 10:57 a.m. *Id.* at ¶ 9.

Short's report of the initial Erickson interview stated that Short learned the following information from Erickson. [Ex. A, at OFFICERS000892-000899; Ex. Y, at p. 145-74 (Doc. 221-6, p. 145-74); Ex. DDD, at ¶ 8 (Doc. 212-2, p. 2)]. On October 31, 2001, Ferguson and Erickson were at the By George nightclub. *Id.* The two had

continually borrowed money from Ferguson's sister, but at some point she refused to provide them with more money. *Id.* Erickson and Ferguson left By George to "rouse someone up for some money." *Id.* Ferguson retrieved a tire tool from the trunk of his car, and as he and Erickson were walking up to the parking lot of the Tribune, Ferguson asked Erickson to hit Heitholt with something. *Id.* Erickson hit Heitholt in the head with the tire tool and Heitholt screamed. *Id.* Erickson noted that he may have vomited at the scene. *Id.* Ferguson went to make sure that Heitholt was dead, and Erickson saw Ferguson strangle Heitholt. *Id.* Erickson saw a cleaning lady at the back door of the Tribune and told her to get help. *Id.* The cleaning lady ran back into the building. *Id.* Erickson saw Ferguson take something from Heitholt's car. *Id.* As Erickson and Ferguson were leaving the Tribune, Erickson ran into Dallas Mallory and told him that they had "beat down a guy." *Id.* According to the report, when Erickson brought up the incident later, Ferguson told Erickson that he wanted to kill someone before he turned 60 anyway. *Id.* The report also noted that when Erickson tried to talk to Ferguson about the murder at a New Year's Eve party a couple of years later, Ferguson told Erickson that if he ever told anyone about the murder, Ferguson would kill him. *Id.* At various points throughout the report, Short noted that he did not think Erickson was being totally forthcoming and that Erickson did not remember certain facts including whether he or Ferguson hit Heitholt, and whether he vomited at the scene. *Id.*

During the second interview, which was recorded, Erickson stated that he hit Heitholt in the head with a tire tool and that Heitholt did not go down immediately, but staggered. [Ex. II (Doc. 215-1); Ex. NNN (Doc. 216-1)]. Either Erickson or Ferguson

threw Heitholt down and Ferguson choked Heitholt to make sure he was dead. *Id.* Erickson described the tire tool as being round, dark steel blue. *Id.* During the interview, Erickson indicated that he was unsure what was used to strangle Heitholt and Short mentioned the belt. [Ex. DDD (Doc. 212-2)]. Short also asked Erickson about the location of Heitholt's keys. *Id.*

At approximately 3:30 p.m. on March 10, Detectives Nichols, Stroer, and Giger drove Erickson around downtown Columbia in an unmarked police car to attempt to help Erickson remember the route he and Ferguson took away from the Tribune the night of the murder. [Ex. A, at OFFICERS001060-001065]. The drive around lasted until approximately 3:57 p.m. [Ex. GGG, at ¶ 6 (Doc. 214-3, p. 1)]. During the drive around, Erickson relayed that the By George nightclub was packed the night of the murder. [Ex. A, at OFFICERS001060-001065]. Erickson told Mallory that it was Ferguson's idea to rob someone, but it was Erickson who "pinned him." *Id.* Erickson remembered saying something to the cleaning woman, but the route he and Ferguson took after the murder was foggy to him. *Id.* Throughout the drive around, Erickson continued to make statements about how he was not sure what had happened and did not recall a lot of that evening. [Ex. YY (Doc. 221-7)].

Later on March 10, Sergeant Monticelli asked Detective Nichols to conduct another interview with Erickson. [Ex. EE, at p. 273 (Doc. 212-3, p. 273)]. Nichols interviewed Erickson from approximately 5:01 until 5:23 p.m. [Ex. AA, at OFFICERS002554]. During this interview, Erickson drew a picture of the tire tool he

12

said was used to murder Heitholt. *Id.* Nichols told Erickson during the interview that it is "you that is on this chopping block." [Ex. EE, at p. 293-94 (Doc. 212-3, p. 293-94)].

Ferguson does not dispute that the reports of Erickson's interviews contain the facts conveyed above. He disputes the credibility of the Defendants. Ferguson also argues that Erickson's statements were speculative, as he repeatedly commented that he could not remember exactly what had happened, and that Defendants should have known that Erickson was not involved in the crime as many of his statements contradicted evidence found at the scene.

### 2. Ryan Ferguson Interviews

At approximately 11:00 a.m. on March 10, Detective Liebhart contacted the Kansas City Missouri Police Department and requested that they attempt to locate Ferguson. [Ex. A, at OFFICERS000725-000731]. Ferguson was located and taken to the Kansas City Missouri Police Department. *Id.* Short and Liebhart traveled to the Kansas City Missouri Police Department to interview Ferguson. *Id.* During the interview with Ferguson, the officers learned that Ferguson knew Heitholt had been murdered on Halloween night 2001, and that three or four weeks before being picked up, Ferguson had discussed the murder with Erickson; Erickson told Ferguson while at a party that he was having dreams about killing Heitholt. *Id.* Ferguson told the officers that on Halloween 2001, he stayed at By George nightclub the entire night. *Id.* He stated that after the bar closed, he and Erickson stayed in the lot for ten to fifteen minutes and talked with his sister, Kelly Ferguson. *Id.* Ferguson said that he had $30 left after the bar closed and did not borrow any money from his sister that night. *Id.* He stated that after he and Erickson

13

left By George that night, he drove Erickson home.  *Id.*  Ferguson consistently denied any involvement in the murder.  *Id.*

Ferguson was transported to the Columbia Police Department.  *Id.*  During the ride, Ferguson said that he had money the night of the murder and had not committed any crime.  [Ex. G, at OFFICERS002552].  When they arrived at the Columbia Police Department, Ferguson was again interviewed.  [Ex. H, at OFICERS002539-002540].  Ferguson said that on New Year's Eve of that year, Erickson told Ferguson that he believed Ferguson had killed Heitholt.  *Id.*  Ferguson claimed that he "did not think twice" about the conversation he had with Erickson and "was having a good time."  *Id.*

On April 30, 2004, a grand jury indicted Ferguson with murder in the first degree and robbery in the first degree.  [Ex. N, at OFFICERS002635-002637 (Doc. 215-11, p. 1-3)].

### 3.  Dallas Mallory Interviews

During one of the initial interviews with Erickson, Erickson mentioned seeing Dallas Mallory after murdering Heitholt.  Around 10:00 a.m. on March 10, Detective Harmon found Mallory and requested that Mallory accompany him to the Columbia Police Department.  [Ex. A, at OFFICERS000914-000917].  Mallory agreed to be interviewed and told Harmon that he did not know Erickson's name but recognized his face.  *Id.*  He denied seeing Erickson on Halloween night 2001.  *Id.*  Mallory consented to take a truth verification exam.  *Id.*  The examination revealed that Mallory was being deceptive.  *Id.*  Two different copies of Columbia Police Department Report 243 exist, which contain different information about what Mallory relayed to the officers during this

14

initial interview. One of the copies of the report, which Ferguson argues was fabricated, notes that "MALLORY said ERICKSON told him he had 'beat someone down.'" [Ex. WW (Doc. 221-3)]. The other copy of the report only includes paragraphs stating that Mallory could not remember if he had seen Erickson and Ferguson on the night of the murder. [Ex. XX (Doc. 221-5)]. After the interview that resulted in the conflicting reports, officers conducted two follow up interviews with Mallory. Mallory has since provided additional information about purported coercion utilized by the officers while interviewing him.

### 4. Meghan Arthur Interviews

On March 11, Officer Stroer interviewed Meghan Arthur about what she knew about the Heitholt murder. Stroer's report stated that Arthur spoke about a disturbing conversation she had with Ferguson on October 31, 2003. [Ex. A, at OFFICERS000882-000887]. According to the report, Ferguson was drunk and high on narcotics and told her that Erickson was trying to get Ferguson to turn himself in for the Heitholt murder. *Id.* Ferguson said that he and Erickson had done something stupid, but Ferguson did not want to turn himself in. *Id.* The report stated that Ferguson said to Arthur that he did not know what happened because he and Erickson had left the scene and did not know how it had ended. *Id.*

Ferguson contends that this report is inaccurate. In a 2015 deposition, Arthur stated that this report contained "a lot of speculation and things that I just didn't say." [Ex. Q, at p. 26 (Doc. 218-6, p. 7)]. She denied saying that she had a "disturbing" conversation with Ferguson, that Ferguson was really drunk, that she believed Ferguson

was high on drugs or uppity and jittery, that Ferguson was upset, and that Ferguson told her that Erickson was trying to get him to turn himself in. [Ex. Q, at 36-38 (Doc. 218-6, p. 9-10); Ex. A, at OFFICERS000882-887].

### 5. Richard Walker Interviews

Richard Walker was an inmate in the same cell block as Ferguson from February 6, 2004, until sometime after April 7, 2004. [Ex. A, at OFFICERS001133-001140]. He was also incarcerated in the same cell block as Erickson for some period of time.

On April 8, 2004, Stroer interviewed Walker after Walker indicated that he had information regarding Ferguson's involvement in the Heitholt murder. *Id.* In Stroer's report, she recorded that Walker relayed the following facts. After Ferguson made contact with Walker on Ferguson's first day at the Boone County Jail, Ferguson told Walker that on the night of the Heitholt murder he and Erickson had left a bar up the street from the Tribune around 1:15 or 1:30 a.m. *Id.* After driving away, they decided that they were going to rob someone for money. *Id.* They hit Heitholt with a tire tool. *Id.* Afterwards, Ferguson took Erickson home. *Id.* According to the report, Ferguson told Walker that he had told Erickson that Heitholt was not hurt that bad and Ferguson did not think that they had killed him, but Ferguson and Erickson stopped being friends because Erickson continued to ask too many questions about that evening. *Id.* According to the report, Ferguson told Walker that he had been given a stress test and that he had beat the test and was going to beat the murder charge because his girlfriend was going to testify that she was on the phone with him and he was calling from his house at the time of the murder. *Id.* Following the April 8 interview, on April 9, 2004, Stroer returned to

16

the jail to obtain a recorded statement of Walker. Defendants state that Walker made substantially the same statement on the 9th that he made on the 8th. Ferguson contends that this report is fabricated. In addition to this fabrication argument, Ferguson denies that Walker was credible in making these statements to the officers, and states that the officers were aware that Walker was not credible.

A second interview of Walker was conducted by Liebhart on September 23, 2004, in which Walker expressed that Ferguson had told him that if Walker would help Ferguson bring discredit to the prosecution regarding Ferguson's case, the Ferguson family would provide an attorney for Walker's daughter, who had charges pending against her. [Ex. A, at OFFICERS001181-001184]. According to Walker, the plan had been that Walker would make statements to the police regarding Ferguson's involvement in the murder and later recant. *Id.* However, after Ferguson refused to follow through on his end of the bargain, Walker decided to back out of their plan. *Id.* According to the report, Walker then described the crime as he claimed Ferguson had explained it to him. *Id.* Ferguson again denies that Walker was credible in making these statements, and states that Liebhart knew that Walker was not credible, as Liebhart admitted in a 2015 deposition that "[Walker's] history would make one believe he's not credible. And then his final interview to me at the Fulton Reception and Diagnostic Center removed all doubt that he had any court credibility." [Ex. DD, at p. 154 (Doc. 212-1, p. 154)].

### D. Erickson Proffer and Guilty Plea

On October 1, 2004, Short and Liebhart received a proffer statement from Charles Erickson. [Ex. A, at OFFICERS001184-001196]. Erickson was asked to review the

17

events that occurred the night of the Heitholt murder and testified that after leaving By George that night, he and Ferguson were out of money and Ferguson said that they were going to have to "rob someone." *Id.* Ferguson removed a tire tool from his car to assist them with the robbery, and began walking downtown in an eastern direction from First Street and Ash. *Id.* After crossing Providence Road, the pair saw a man in the parking lot of the Tribune, so they hid behind dumpsters as they watched the man him. *Id.* Erickson ran toward the man and hit him with a tire tool. *Id.* He did not know if he hit the man more than once. *Id.* When the man went to the ground, Erickson stopped hitting him and went and sat on the wall directly across from where the man was. *Id.* When he looked up, he saw the man face down on the concrete with Ferguson on top of him. *Id.* Ferguson was strangling the man with a belt. *Id.* Some people came out the back door of the Tribune and said something, but Erickson could not remember what was said. *Id.* Erickson told the people to go get help because someone was hurt. *Id.* Erickson stated that either he or Ferguson touched the man's cell phone as it was on the concrete in the drive and took the victim's keys. *Id.* Erickson took the belt and the man's wrist watch from the scene. *Id.* They also took the man's keys and the tire tool and ran from the scene in the opposite direction from which they had come. *Id.* After running away, they ran into Mallory and described the crime to him. *Id.* When they reached Ferguson's car, Ferguson placed the things they had taken from the man in a plastic bag and the two returned to By George. *Id.* After making his initial statement, Erickson answered a variety of questions posed to him by the officers. *Id.*

18

On November 4, 2004, Erickson and Judge Kevin Crane[1] signed an agreement with Erickson stating that he would testify truthfully at Ferguson's trial in exchange for the state recommending sentences of 15 years for Count I (Murder in the Second Degree), 15 years for Count II (Robbery in the First Degree), to be served concurrently with Count I, and 10 years for Count III (Armed Criminal Action), to be served consecutively with Counts I and II.  [Ex. FF (Doc. 212-5)].  That same day, Erickson pleaded guilty to all three counts.  [Ex. M, at OFFICERS002516-002538 (Doc. 215-8, p. 1-23)].  Erickson testified that no one had threatened or coerced him in any manner in order to get him to plead guilty against his will.  *Id.* at OFFICERS002525.

### E.  Investigation by Ferguson Defense Team

After Ferguson retained defense counsel, his attorneys sought out many of the witnesses originally interviewed by the Defendant Officers.  Many of the witnesses described problems with the investigation originally undertaken by the Columbia Police Department.

#### 1.  Interview of Meghan Arthur

On October 13, 2004, Arthur was interviewed by Jim Miller, an investigator for Ferguson's attorney, and Arthur relayed to him that in October 2003, she had been at a party with Ferguson and overheard Ferguson talking about something that Erickson had told Ferguson.  [Ex. O, at CITY0003362].  She said that Ferguson was "distressed about

---

[1] Judge Crane was the Boone County prosecutor throughout 2004 and 2005 when the cases against Erickson and Ferguson were prosecuted.  He currently serves as a Boone County Circuit Court judge.

19

whatever they were talking about like the confusion or whatever it was that they were talking about."  [Ex. GG, at p. 5 (Doc. 214-2, p. 5)].

Arthur next pointed out to Miller the inaccuracies she saw in Report 252, the report generated about her initial interview by Stroer, which included her changing a note that Ferguson was "really drunk" to simply read "drunk"; noting that contrary to the report, she did not believe Ferguson had taken cocaine the night she overheard the conversation at the party; she did not believe Ferguson had been "uppity and jittery" the night of the conversation; she believed Stroer took what Arthur said about how Ferguson sometimes acted, and transferred it into the report; and Arthur speculated that Ferguson and Erickson may have been talking about drugs the night she overheard the conversation.  [Ex. O, at CITY0003362].  She finally noted that she felt that the report was "dramatized," and that she was not really sure about exactly what happened that night, while the report made it seem like she was sure.  *Id.*

### 2.  Interview of Dallas Mallory

Miller interviewed Mallory on December 1, 2004, and Mallory provided him a typed affidavit stating that he had been coerced into providing his original statement. [Ex. S (Doc. 220-3)].  According to the affidavit, Mallory told the police officers on March 10, 2004 that he had not seen Erickson or Ferguson in downtown Columbia on the night of the Heitholt murder.  *Id.*  Police officers began yelling at Mallory, called him a liar, and threatened to charge him with murder.  *Id.*  Mallory became very scared and emotional as the officers continued yelling.  *Id.*  Mallory stated that he never told the police that Erickson was being "fidgety and pushing" or saying "something about a fight"

20

or "we beat someone down." *Id.* Mallory's affidavit stated that he did not remember seeing Erickson or Ferguson in downtown Columbia on October 31 or November 1, 2001, or remember Erickson telling Mallory the information contained in the police report regarding his initial interview. *Id.*

In July 2008, testimony was taken in connection with Ferguson's motion for post-conviction relief. [Ex. NN, at FERGUSON004957-005755 (Docs. 216-1, 216-2, 217-1, 217-2, 218-1)]. Mallory testified that he told the police officers "what they wanted to hear" in March 2004.

### 3. Interview of Richard Walker

When Miller interviewed Walker in January 2005, Walker told Miller that he did not have any memory of talking to Ferguson about the murder. [Ex. TT, at FERGUSON008629 (Doc. 220-5, p. 1); Ex. LL]. He said that he remembered the police interviewing him and telling him to "say what I remembered the best that I remembered." *Id.* However, Walker told Miller that he "basically can't remember nothing anymore." *Id.* Walker said that he believed that Ferguson was innocent. *Id.* Walker stated that there was a possibility that he got the information conveyed during the prior interviews from newspaper or television. *Id.* at 2. Walker told Miller during the 2004 interviews, the police were trying to "use my words in a different way than I said them or they told me what to say." *Id.* at 10. Richard Walker died on November 19, 2005, at the Jefferson City Correctional Center. [Ex. MM (Doc. 215-9)].

### 4. Interview of Michael Boyd

Miller interviewed Boyd on February 18, 2005. [Ex. OO (Doc. 218-3)]. Miller's notes from the interview contain no mention that Boyd saw two young, white guys standing near the dumpsters of the Tribune building. *Id.* However, a report from July 25, 2005, when Boyd was interviewed for the State by Haws, noted that Boyd told Haws that as he was driving away from the Tribune and passed the wall where the dumpsters were located, he saw two young white guys. [Ex. PP, at FERGUSON00678 (Doc. 218-5, p. 1)]. Boyd has given inconsistent statements about the color of the car he was driving on the night of the murder. [Ex. OO, at FERGUSON00681 (Doc. 218-3, p. 1); Ex. PP, at FERGUSON00679 (Doc. 218-5, p. 2)].

### F. Criminal Trial of Ferguson

Ferguson's criminal trial began on October 14, 2005. [Ex. B, at FERGUSON002305-004756 (Docs. 205-2, 206-1, 206-2, 207-1, 207-1, 208-1, 208-2, 209-1, 209-2, 210-1, 210-2, 211-1)]. At trial, Erickson testified consistent with his proffer and guilty plea that he and Ferguson murdered Kent Heitholt. *Id.* Erickson also testified about how he had started to remember his involvement with the murder in 2004. *Id.* He explained that when a local newspaper ran a story regarding the murder on the second anniversary of the incident, he started to think about that night and slowly remember bits and pieces about what had occurred. *Id.* Following this article, he began to talk with his friends about his regrets and approached Ferguson about their involvement in the murder. *Id.*

Erickson acknowledged during his testimony that there were some things about the murder he did not remember at the time he was interviewed by the Columbia Police

Department that he did remember after the interviews were over. *Id.* He also stated that while he was in jail, he received "discovery" from his attorney which included police reports. *Id.* According to Erickson during Ferguson's trial, he "didn't dream anything," and was certain that he and Ferguson were responsible for the murder. *Id.*

Meghan Arthur, Dallas Mallory, and Richard Walker were not called at Ferguson's trial. *Id.* On October 21, 2005, the jury found Ferguson guilty of murder in the second degree and robbery in the first degree and sentenced him to thirty years imprisonment for the murder charge and ten years imprisonment for the robbery charge. *Id.*

### G. Post-Conviction Relief

On February 14, 2011, Ferguson initiated a state habeas corpus proceeding by filing a Rule 91 petition. [Ex. R (Docs. 219-1, 219-2, 220-1, 220-2)]. Arthur's deposition was taken in conjunction with that suit, and after reviewing the report of Stroer's interview with her she testified that "I have to say if it's in this report, that it's accurate. My memory now is just not that clear." [Ex. P, at FERGUSON006773 (Doc. 218-4, p. 36)]. She stated that she believed she would have told Stroer the words contained in the report, and that she told Stroer that Ferguson told her that Erickson was trying to get them to turn themselves in. *Id.* at FERGUSON006738-006825. She also noted that during the interview, Stroer was not putting words in her mouth and did not ask leading questions. *Id.*

In addition to Arthur, Erickson, Boyd, and Bennett were also called to testify at the habeas proceeding. Erickson stated that he had no memory of October 31, 2001 after

being at the By George bar and that his trial testimony was a lie. [Ex. QQ, at FERGUSON007167-007169 (Doc. 218-7, p. 309-11)]. Boyd testified that he was driving a red car the night of the murder and that as he was leaving the parking lot of the Tribune building, he saw two people walking in an alley. *Id.* at FERGUSON007361-007401. Bennett testified that she saw Ferguson and Erickson get in a car and drive off from By George around 1:30 a.m. *Id.* at FERGUSON007318-007361.

On January 30, 2013, Ferguson filed a writ of habeas corpus in the Missouri Court of Appeals, Western District. [Ex. R (Docs. 218-1, 218-2, 219-1, 219-2)]. Ferguson argued that habeas corpus was necessitated by 1) the recantations of Trump and Erickson; 2) the prosecution's decision to use testimony it knew or should have known was false; 3) the prosecution withholding exculpatory and impeachment evidence; and 4) the Lincoln County opt out procedure which allowed otherwise qualified jurors to pay a fee and perform community service in lieu of jury duty. *Id.* On November 5, 2013, the Court of Appeals granted Ferguson's request for habeas corpus, concluding that "Ferguson has established the gateway of cause and prejudice, permitting review of his procedurally defaulted claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by withholding material, favorable evidence of an interview with Barbara Trump, the wife of Jerry Trump, one of the State's key witnesses at trial." [Ex. V, at p. 2 (Doc. 220-8, p. 2)]. Beyond this *Brady* violation, the court did not address the merits of Ferguson's claims. *Id.* at 18.

### H. Subsequent Testimony Related to this Action

#### 1. Dallas Mallory Testimony

Mallory's deposition was taken again on March 30, 2015. He testified that he did not see Erickson or Ferguson on November 1, 2001 near the scene of the murder. [Ex. T, at p. 41 (Doc. 220-4, p. 41)]. He testified that on the night of the murder he may have consumed marijuana and consumed one fifth of Captain Morgan and beer. *Id.* at 105, 159. He stated that his memory was enhanced when he drank. *Id.* at 19-20. He testified that the Columbia Police Report documenting his March 2004 interview was fabricated, as was his January 4, 2005 interview with Judge Crane and White. *Id.* at 91, 136.

### 2. Meghan Arthur Testimony

Arthur's deposition was taken on April 16, 2015. [Ex. Q (Doc. 218-6)]. She testified that there were various inaccuracies in Report 252, but noted that her memory was not definitive enough to say what she had actually witnessed and overheard on the night of October 31, 2003, and that she would refer to her previous statements. *Id.* at 41. She stated that she did not tell Stroer that Ferguson told her that he and Erickson had done something stupid. *Id.* at 43. She also stated that she did not tell Stroer that Ferguson told her that Erickson was trying to pull him into the murder and that he did not want to turn himself in. *Id.* On cross examination, Arthur agreed that her memory was clearer on April 16, 2015, than it had been when she gave her original deposition. *Id.* at 171.

### 3. Charles Erickson Testimony

During Erickson's deposition on May 1, 2015, he testified that his statement that he was the sole perpetrator of Heitholt's murder was a lie "to help Ryan get out of prison." [Ex. SS, at p. 124]. He testified that he prepared and signed an affidavit in

August 2011 which stated that after his arrest he was given discovery which included statements by Mallory, Trump, and Arthur. *Id.* at 137. He claims that his decision to plead guilty to the murder was influenced by these statements.

## II.    Discussion

Ferguson has brought six claims against the Defendant Officers. The officers contend that they are entitled to summary judgment on these claims under the doctrine of qualified immunity. Qualified immunity absolves Defendant Officers from civil liability for damages for "performing discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether the officers are entitled to qualified immunity, the Court must determine (1) whether Ferguson has "asserted a violation of a constitutional or statutory right" and (2) whether that right was clearly established at the time the alleged unlawful act occurred. *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000). A right is not clearly established unless the law gives the official "fair warning" that the official's conduct would violate the right. *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). The Defendant Officers bear the burden of proving that they are entitled to qualified immunity. *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). "If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment." *Id.*

### A.  Count I – Procedural Due Process

Ferguson first contends that Defendant Officers violated his procedural due process rights by committing numerous *Brady* violations. The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution." *Id.* at 87. *Brady* applies to both impeachment and exculpatory evidence. *U.S. v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994). Ferguson contends that Defendant Officers impermissibly withheld evidence related to the officers' interviews of Michael Boyd, Kim Bennett, and Dallas Mallory.[2]

In order to demonstrate that the Defendant Officers committed a *Brady* violation, Ferguson must be able to prove that the officers "intended to deprive the defendant of a fair trial." *White*, 519 F.3d at 814 (quotation omitted). The officers' failure to preserve or disclose potential useful information to Ferguson does not constitute a due process violation unless the failure was the result of bad faith. *Id.* However, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines

---

[2] In the Complaint Ferguson also alleged a *Brady* violation for withholding information received from Richard Walker. Defendants argued at length in their motion for summary judgment that there was no *Brady* violation committed with respect to the Walker information. Ferguson did not respond to this argument in his suggestions in opposition to the motion for summary judgment. The Court finds based on Defendants' arguments that there was no *Brady* violation committed related to this information, which consisted of non-exculpatory documents irrelevant to impeachment.

confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

In granting Ferguson's petition for habeas corpus, the Missouri Court of Appeals concluded that the State committed a *Brady* violation by failing to disclose the content of an interview the State conducted with Barbara Trump, Jerry Trump's wife. The court concluded that this violation necessitated vacating Ferguson's conviction. In the Barbara Trump interview, she reported to Officer Haws that she had no recollection of sending her husband a newspaper while he was in prison. However, Jerry Trump claimed to have received a newspaper from his wife, which contained pictures of Erickson and Ferguson and sparked his memory to be able to identify the pair as the individuals he saw in the Tribune parking lot the night of the Heitholt murder. Barbara Trump's statement that she did not remember ever having sent her husband a newspaper while he was in prison was therefore deemed "evidence that could have been used to impeach a key government witness." *Ferguson v. Dormire*, 413 S.W.3d 40, 58 (Mo. Ct. App. 2013) (quotation omitted).

The court of appeals concluded that the State's failure to disclose the Barbara Trump interview was particularly material when "considered in conjunction with the other information the State failed to disclose to Ferguson." *Id.* at 66. The court went on to discuss three other pieces of evidence the State failed to disclose, including the content of an interview conducted with Melissa Griggs, who told Officer Haws that By George closed at 1:30 a.m. on the night of Heitholt's murder; a statement from Ornt that "'she couldn't make an identification' from the pictures of Ferguson and Erickson in the

28

newspaper"; and Jerry Trump's delayed sudden ability to identify Ferguson and Erickson. *Id.* at 66-71. The court concluded that the *Brady* violation undermined confidence in the outcome of Ferguson's trial given this "pattern of nondisclosures." *Id.* at 71. However, it also specifically noted that "if a defendant knows or learns of undisclosed information through some other means before or during trial, a conviction will not be overturned under *Brady*." *Id.* at 68. As Ferguson independently learned of these three pieces of evidence before or during trial, they did not constitute independent *Brady* violations, and only affected the materiality of the Barbara Trump *Brady* violation as the Court assessed whether Ferguson's verdict was worthy of confidence despite the State's misconduct. None of the *Brady* violations alleged by Ferguson in this § 1983 action were addressed by the Missouri Court of Appeals in vacating Ferguson's conviction.

### 1. Michael Boyd Statements

During Ferguson's habeas corpus proceeding in 2012, Michael Boyd testified that while leaving the Tribune building on the night of the Heitholt murder, he observed two people walking through the alley behind the building. [Ex. QQ, at p. 513-14 (Doc. 218-7, p. 513-14)]. Ferguson's counsel questioned him specifically about the timing of his observations, and Boyd stated that he saw two individuals around 2:20 a.m. [Ex. 11, at p. 113-14 (Doc. 238, p. 13-14)]. Ferguson contends that this information was crucial to the defense because it provided an alibi to the two men in the alley as the murder had already occurred by the time Boyd saw the men in the alley. Ferguson argues that the State's timeline presented at trial theorized that Ferguson and Erickson were hiding behind the

dumpsters in the Tribune parking lot at 2:12 a.m. and murdered Heitholt sometime before

Trump and Ornt came upon the scene at 2:20 a.m.

The Court cannot conclude that a *Brady* violation was committed with respect to

this evidence as Ferguson's attorney, Charles Rogers, was in possession the information

time of Ferguson's criminal trial. Rogers stated that he recalled reading Miller's report

of his interview with Michael Boyd, which indicated that Boyd had a conversation with

Heitholt sometime between 2:10 and 2:15 a.m.:

> Q: I'm going to show you Mr. Miller's interview of Mr. Boyd . . .
>
> . . .
>
> Q: Okay. And do you recall reading Mr. Miller's report about his interview with Michael Boyd?
>
> A: Yes.
>
> Q: And Mr. Boyd told Mr. Miller that the conversation occurred between 2:10, 2:15 a.m.?
>
> A: It's in the report, yes.
>
> Q: And there – there is nothing in Mr. Miller's interview of Michael Boyd that indicates Mr. Boyd saw two white males near the – the Tribune on the night of the murder; is that right? Take – take your time to –
>
> A: That's correct, nothing indicating that – that Boyd told Miller he saw two white males there.

[Ex. JJ, at p. 70-71 (Doc. 215-3, p. 18)]. This statement establishes that Rogers knew that

Boyd and Heitholt had a conversation in the parking lot between 2:10 and 2:15 a.m. This

interview does not contain any interview about Boyd observing individuals in the alley.

However, Rogers also testified that he also received a copy of later June 2005 interview

of Boyd conducted by Haws:

> Q: And I'm going to hand you Exhibit 10 . . . which I'll represent to you is the Bill Haws Interview of Mr. Boyd . . .

30

And it looks like it's dated June 24, 2005. And please take your time reviewing it, if you need to.

A:   (Witness complies.) Yes.

Q:   Okay. And you – you would've been actively working on Mr. Ferguson's case at this time, correct?

A:   Yes.

. . .

Q:   And – and you certainly wouldn't dispute that you received a copy of Mr. Haws' interview of Mr. Boyd.

A:   I do not dispute it.

Q:   Do you recall seeing this at all?

A:   Very vaguely.

Q:   I'm going to direct your attention to the bottom paragraph on the first page.

A:   Right.

Q:   Boyd told Mr. Haws, as he passed the wall where the dumpsters were located he saw two white guys standing there. Boyd said he could not identify these individuals, he said he could not describe their clothing, he just knew there were two young, white guys standing near the dumpsters as he drove away. Boyd said he thought nothing of it because they looked all right and there were always people out at that night in that part of Columbia. Did I read that accurately?

A:   You read that accurately.

Q:   And – and you would have reviewed that information somewhere when you received this report in discovery, correct?

A:   I'm sure I did, yeah.

*Id.* at 71-73. This second report, which Rogers admits to having reviewed, did contain the information about Boyd seeing two white guys standing near the dumpsters behind the Tribune. Ferguson does not contest Defendants' assertion that "Rogers testified that he received a copy of the police reports documenting the interviews of Michael Boyd." [Doc. 234, p. 154]. Rogers' testimony establishes that between the report from the Miller interview and the report from the Haws interview, Rogers was in possession of the

31

information that following Boyd's conversation with Heitholt in the parking lot around 2:10 or 2:15 a.m., Boyd saw two white guys standing near the dumpsters by the Tribune.

This information is substantially the same as the information Boyd reiterated during his 2012 deposition, which Ferguson argues was improperly withheld from him in violation of *Brady*. The Court notes in reviewing this evidence that it is from a deposition conducted in 2012, seven years after Ferguson's criminal trial. In arguing that Defendants committed a *Brady* violation, Ferguson does not cite to any specific interviews, reports, or testimony rendered prior to his trial which were allegedly not disclosed by the State. He contends only that the information relayed in this 2012 interview was improperly withheld prior to his trial. Drawing all inferences in the favor of Ferguson, the non-movant, the Court will evaluate Boyd's 2012 testimony as though Defendants were in possession of the statements prior to Ferguson's trial. Boyd stated during this deposition that after he and Heitholt were done talking in the parking lot that night he saw two individuals in the alley by the building:

> They're close towards the wall area or dumpster area or whatever and – But they're walking. They're not hiding. They're not – You know, they're just walking, and I am embarrassed because I wasn't paying attention coming around the corner. And I was like, you know, okay. Don't yell at me, and, you know, I didn't see you. I am sorry and everything, and I just drove on, but I didn't really get a good look at them because I was more concerned with, you know, okay. Pay attention, dummy, you know.

[Ex. 11, at p. 104 (Doc. 238, p. 4)]. Following Boyd's description of his observations in the lot that night, Boyd was questioned extensively about the timing of his observations:

> Q:     You said before – In your first interview you say you leave at two twenty. So, is it around two twenty when you see them?

32

> A. Exact time frame, I do not know, but at the same time, yeah, between that area, that time.
> Q: So when you say that time, it's close to two twenty?
> A: Two twenty, yeah.
> Q: Right. I mean, it's not two a.m.; right?
> A: No.
> Q: And it's not ten after two. It's closer to two twenty?
> A: Closer to two twenty.

*Id.* at 113-14. This information is substantively identical to the information conveyed to Ferguson in discovery, which his attorney stated included a report placing Boyd and Heitholt in the Tribune parking lot having a conversation between 2:10 and 2:15 a.m., and a second report noting that when Boyd left the lot following the conversation, he observed two individuals standing near the dumpsters. There is no evidence in the record which suggests that Defendants were in possession of a more specific timeline regarding Boyd's presence in the lot and observations in the alley at the time of trial which was not turned over to Ferguson. The uncontroverted evidence of the record shows that as of the time of Ferguson's criminal trial in October 2005, the content of the relevant Boyd statements had been disclose to Ferguson's counsel. As Ferguson was in possession of this information at the time of trial, there was no *Brady* violation with respect to this evidence.

### 2. Kim Bennett Interview

Ferguson next argues that Officers Short and Liebhart withheld exculpatory information provided by Kim Bennett, who informed the officers that she observed Ferguson and Erickson leave By George between 1:15 and 1:30 a.m. and drive away without retrieving a tire tool or opening the trunk. The State theorized at Ferguson's trial,

33

however, that Ferguson murdered Heitholt sometime between 2:12 and 2:26 a.m., nearly a full hour after Bennett states she saw Erickson and Ferguson drive away from By George. [Ex. B, at FERGUSON004617 (Doc. 211-1, p. 19)]. Even if Bennett had testified at Ferguson's criminal trial that she observed him drive away from By George at 1:30 and the jury found her testimony credible, Bennett's statement would not have precluded Ferguson and Erickson from traveling the few blocks from By George to the Tribune building by 2:10 a.m. consistent with the State's timeline. Therefore, even if Defendants improperly withheld this information from Ferguson, the suppression does not "undermine confidence in the outcome of the trial," as the outcome of the trial was not inconsistent with the Bennett evidence. *Kyles*, 514 U.S. at 434.

Ferguson argues that this information was exculpatory because it completely impeached the State's theory told through Erickson. To say that Kim Bennett's statements "completely impeached" the State's theory is inaccurate. It is true that Erickson did not mention driving away from By George during his interview with Short. Erickson merely agreed when with Detective Short's suggestion that he and Ferguson walked away from By George. [Ex. II, at p. 3 (Doc. 215-1, p. 2)]. Other than the inconsistency between walking and driving from the scene, however, Bennett's statement is not inconsistent with Erickson's statements to Short.

Bennett's statements are also largely consistent with Erickson's trial testimony. Erickson testified at trial that after he and Ferguson had been at By George for a while, they left the bar and started walking to Ferguson's car. [Ex. B, at FERGUSON002891 (Doc. 206-2, p. 196)]. After they arrived at the vehicle, Erickson testified that "We got

34

into the car. And I told him I wanted to go home. He said, 'Well, if we could get some more money, we could get some more drinks. We could buy some more drinks and stay out later.' And he proposed that we rob someone in order to get more money to buy more drinks." *Id.* at FERGUSON002892-93. Erickson testified that after the two decided to rob someone, "we got out of the car, and we decided that we should go downtown, in the – more in the center of downtown, and get away from the club, when we were going to do this robbery." *Id.* at FERGUSON002893. The only clear difference between Erickson's testimony and Bennett's statement is Bennett's contention that she saw Ferguson and Erickson drive off. This is not enough to undermine confidence in the verdict. It is entirely possible that Bennett observed Ferguson and Erickson walk away from By George, get into Ferguson's car, and assumed they drove off. As noted above, even if she did see them drive off in conflict with Erickson's statement, this would not have precluded them from re-parking elsewhere in downtown Columbia and walking the short distance to the Tribune building. Any impeachment value to this evidence is minimal at best. The Court cannot conclude that the State's failure to produce Bennett's statement in any way undermines confidence in Ferguson's conviction. As such, Ferguson has presented insufficient evidence to support his claim of a *Brady* violation with respect to Bennett's statement.

### 3. Dallas Mallory Interview Tactics

Ferguson's final argument in support of his procedural due process claim is that Defendant Officers violated *Brady* when they failed to disclose coercive tactics used during their interview of Dallas Mallory. Neither party cited and the Court is unaware of

35

any law suggesting that *Brady* requires disclosure of the type of interview tactics allegedly used to coerce Mallory's confession. Even if *Brady* did compel disclosure of this type of information, Mallory provided an affidavit to Ferguson's counsel in December 2004 stating that he "was so scared at the second interview, 09/14/04 from the abuse I was subjected to in the first interview, 03/10/04 that I was saying what the police wanted to hear to avoid the threat and abuse again." [Ex. S. (Doc. 220-3)]. Thus, Ferguson's counsel knew about the alleged coercion and falsities in Mallory's statements to the officers well before Ferguson's trial began on October 14, 2005, and there was no *Brady* violation.

As Defendants committed no *Brady* violation with respect to these three pieces of evidence, summary judgment is granted for the Defendants on Ferguson's Count I, procedural due process claim.

### B. Count II – Substantive Due Process: Fabrication of Evidence

Under the Fourteenth Amendment, the guarantee of substantive due process "'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Moran v. Clark*, 296 F.3d 638, 643 (8th Cir. 2002) (quoting *Weiler v. Purkett*, 137 F.3d 1047, 1051) (8th Cir. 1998) (en banc)). This protection "prohibits conduct that is so outrageous that it shocks the conscience or otherwise offends judicial notions of fairness, or is offensive to human dignity." *Id.* (quotations omitted). "[W]hen a person is damaged by outrageous police misconduct but the resulting injury does not neatly fit within a specific constitutional remedy, the injured party may, depending upon the circumstances, pursue a substantive

36

due process claim under section 1983." *Id.* at 646.  Ferguson argues that Defendant Officers fabricated evidence used to induce Erickson's guilty plea and testimony implicating Ferguson in the Heitholt murder, which constitutes a substantive due process violation able to be remedied by section 1983.

### 1.  Erickson Confession

#### a.  Ferguson's Right to Assert Claim

Defendant Officers contend that Ferguson's claim constitutes an improper attempt to challenge Erickson's conviction.  Defendants raise a host of issues with the claim premised on this improper challenge: (1) Ferguson lacks standing to challenge the conviction; if the Court concludes that he has standing to pursue the claim, (2) Ferguson's claim is barred by *Heck v. Humphrey*, 512 U.S. 447 (1994); (3) the claim is barred by the Rooker-Feldman doctrine, (4) Ferguson is collaterally estopped from raising this claim, and (5) the claim is barred by res judicata.

These arguments fundamentally misunderstand the premise of Ferguson's claim. Ferguson has not asserted that Erickson's guilty plea should be invalidated or that his confession or guilty plea was coerced.  Instead, Ferguson contends that the Defendant Officers fabricated evidence through Erickson, which was then used at trial against Ferguson and caused him harm.  None of these assertions bear on the validity of Erickson's guilty plea, which Erickson has never attempted to withdraw.

Defendants repeatedly argue that if Ferguson were to be successful on his claim, it would necessarily imply invalidity of Erickson's state criminal conviction.  This argument ignores the importance of the individual rights the Constitution affords

37

Ferguson independent of Erickson's conviction. One criminal defendant's decision to plead guilty cannot preclude alleged co-conspirators from asserting shortcomings with the evidence existing at the time of the plea in their own defense. *C.f. Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that a section 1983 plaintiff must be able to prove that his own conviction being challenged in the 1983 action has been overturned, invalidated, or called into question before the 1983 claim may be pursued). Furthermore, the Missouri Court of Appeals' decision to grant Ferguson's habeas corpus petition, and recognition of "Erickson's recantation of his 'seriously undermined' trial testimony implicating himself and Ferguson in the murder of Mr. Heitholt," suggest that the underlying facts surrounding Erickson's conviction have already been questioned to some extent. *Ferguson v. Dormire*, 413 S.W.3d 40, 72-73 (Mo. Ct. App. 2013). To the extent that Erickson's conviction has already been questioned, Defendant Officers' concerns about implicit invalidity of the conviction are not unique to Ferguson's section 1983 lawsuit and do not justify the Court barring Ferguson's claims.

Finally, even if a jury were to conclude that there were constitutional deficiencies in the Defendant Officers' conduct in securing Ferguson's conviction, this conclusion would not necessarily imply anything about Erickson's guilty plea. Erickson chose to speak to the officers and plead guilty after undergoing multiple interviews and consulting with an attorney over the course of months. The validity of Erickson's guilty plea is dependent on factors beyond the issues alleged by Ferguson, and Ferguson has never contended that there are any legal shortcomings with Erickson's plea.

38

Because Ferguson's claim is independent from Erickson's conviction and guilty plea, none of Defendant Officers' arguments regarding the claim being barred are persuasive. There is no standing problem in this case because Ferguson is alleging that he suffered harm due to improper evidence used to convict him in state court. The fact that Ferguson has standing to bring this claim, however, does not mean that he is in privity with Erickson such that collateral estoppel or res judicata bar his claims.[3] Ferguson and Erickson were convicted in separate proceedings based on separate evidence and pleas and received separate sentences. As Ferguson was not a party to Erickson's case or conviction, and the outcome of this case has no bearing on Erickson's conviction or guilty plea, the Rooker-Feldman Doctrine also does not bar Ferguson's claim. *Heck v. Humphrey* does not bar Ferguson's claim because Ferguson was not a party to Erickson's conviction. *See Hayward v. Cleveland Clinic Foundation*, 759 F.3d

---

[3] Defendants discuss *James v. Paul*, 49 S.W.3d 678 (Mo. banc 2001), at length in support of their collateral estoppel argument. *James v. Paul* held that the plaintiff in an insurance action was collaterally estopped from contesting whether the defendant in the underlying criminal case had intended to injure the plaintiff, when the defendant had plead guilty to assault. The *James* court held that a court must consider four factors in determining whether to give preclusive effect to a prior judgment: (1) whether the issue decided in the prior adjudication was identical to the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom estoppel is asserted was a party or was in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue litigated in the prior suit. Here, the issue being asserted by Ferguson is not the same as the issue in the present action. Neither Ferguson nor Erickson has ever been party to a suit involving adjudication of whether defendants fabricated evidence. Moreover, unlike James, Ferguson was not a third party beneficiary to Erickson's guilty plea. None of the justifications for the application of collateral estoppel in *James* apply to Ferguson's case.

601, 616 (6th Cir. 2014) (noting that "*Heck* does not apply to third-party § 1983 claims.").[4]

Finally, Defendants argue that "the allegations against Defendant Officers in this lawsuit have not been called into question by any Court." Presumably, Defendants meant to argue that the Defendant Officers' actions have not been criticized or deemed to violate Ferguson's constitutional rights by another court. While no court has specifically addressed the legality of Defendants' actions to this point, dicta from the Missouri Court of Appeals suggests that the court saw at least some error in the officers' actions. *See Ferguson v. Dormire*, 413 S.W.3d 40, 73 (Mo. Ct. App. 2013). Moreover, it is not necessary for Ferguson to be able to prove that courts have endorsed his arguments prior to the filing of his § 1983 action. While *Heck* would prevent him from filing a § 1983 lawsuit which would appear to invalidate an existing conviction, Ferguson's conviction has been vacated and he is free to pursue his civil claim without first having to prove its validity elsewhere.

### b. Fabrication of Evidence Through Erickson

---

[4] While Defendant Officers cite one unpublished district court opinion applying *Heck* to a third-party claim, *Barton v. Priest*, 2008 WL 4372637, at *5 (E.D. Mich. 2008), the Court concludes consistent with the Sixth Circuit that this is not the appropriate rule. *See also Beets v. County of Los Angeles*, 200 Cal. App. 4th 916, n.2 (2011) (noting that "we do not find *Barton*'s brief analysis of these issues instructive."). Ferguson was not a party to Erickson's conviction. Moreover, Erickson decided it was in his best interest to plead guilty to the Heitholt murder rather than contesting the charge and proceeding to trial. Ferguson and Erickson were not positioned similarly in incurring their convictions, and any waiver of rights or arguments Erickson made in pleading guilty to the offense cannot be held against Ferguson.

40

Ferguson argues that the Defendant Officers fabricated evidence against him in violation of the Fourteenth Amendment. "[A] manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant." *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012). In order to constitute a Fourteenth Amendment violation, defendants' actions must be "conscience-shocking." *Id.*

Defendants first claim that Ferguson has failed to state a claim because he admits that the alleged fabricated evidence was not used to obtain his conviction. In support of their allegation, Defendants cite paragraph 185 of the Complaint, which states "The prosecution's case was based entirely on the fact that Erickson took a plea for 25 years to testify against Ryan, and the identification of Ryan made by Jerry Trump." Nowhere in this or the surrounding paragraphs does Ferguson admit that fabricated evidence was not used to obtain his conviction. *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001), cited by Defendants in support of their contention, merely reiterates the validity of Ferguson's claim:

> Appellants argue that this claim is not cognizable because it is an attempt by Wilson to assert the constitutional rights of a third party.[] The district court correctly noted that this claim is not an attempt by Wilson to assert Wall's rights, but rather a claim that the appellants knowingly used false or unreliable evidence (the coerced statement from Wall) against Wilson at his criminal proceedings. If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated.

*Id.* at 954. Defendants contend that *Wilson* is distinguishable because Erickson's confession was not used in Ferguson's criminal proceedings (rather, Erickson testified

41

against Ferguson), so Ferguson is asserting Erickson's rights in claiming that the confession was coerced. Whether or not Erickson's confession was coerced, however, is not the issue before the Court. As in *Wilson*, the issue is whether Defendants "knowingly used false or unreliable evidence" against Ferguson in his criminal proceedings. The Court need not consider, and makes no findings here regarding the validity of Erickson's confession in order to establish whether Defendants knowingly used false or unreliable evidence against Ferguson via Erickson's testimony.[5]

Ferguson argues that despite Erickson's obvious lack of personal knowledge regarding the circumstances surrounding Heitholt's murder, Defendants fed him information and used him to fabricate evidence against Ferguson. As a result of the fabricated evidence and reckless investigation, Ferguson contends, the officers induced Erickson to plead guilty and testify falsely against him. Ferguson argues that the Defendant Officers should have known that Erickson was an unreliable witness for the following reasons: (1) they should have recognized signs of Erickson's drug use prior to the interview, (2) Erickson displayed memory loss, (3) they failed to ask him about alcohol or drug use at the time of the murder, (4) Erickson stated that Heitholt was face

---

[5] As Defendants note in their briefing, after the initial interrogation of Erickson the officers conducted a follow up interview with Erickson's attorney present. In that interview Erickson reiterated his statement that he and Ferguson were involved in the murder. Over a month later, Erickson plead guilty to three felony counts and in doing so testified that no one had threatened him or coerced him and that he and Ferguson killed Heitholt. Given the presence of Erickson's attorney and extended period of time between Erickson's statements to the officers and the court, there may have been no legal deficiencies in Erickson's confession. However, even if Defendant Officers proved that Erickson's confession was legally sound, this would not necessarily mean that the Defendant Officers' actions in eliciting the confession and Erickson's testimony at Ferguson's trial were constitutionally sound with respect to Ferguson's rights.

42

up when Ferguson strangled him but the officers knew that Heitholt had been found face down, (5) Erickson claimed Ferguson's father had found Heitholt's wallet at Ferguson's residence, but the wallet was found in Heitholt's car, (6) Erickson stated that Heitholt was strangled with a shirt when the officers knew he had been strangled with a belt, (7) the path Erickson described the boys taking at the scene was inconsistent with the results of luminol testing, (8) Erickson claimed to have been wearing a coat at the scene, but no witnesses described the boys as wearing coats, (9) Erickson claimed that Heitholt had kicked him, but stated that he had no injuries the next day, (10) Erickson errantly described Boyd as a white man, (11) Erickson claimed to only have hit Heitholt one time when Heitholt had been hit many times, (12) Erickson claimed he yelled to Ornt to get help, but no help statement was ever made, (13) Ornt claimed a blonde individual said "somebody's hurt here man," and Erickson is not blonde, (14) Erickson stated he vomited at the scene, but no vomit was found at the murder site, (15) the officers tampered with Report 243, which Erickson relied on in deciding to plead guilty, and (16) the officers obtained the confession through 44 leading questions that provided all of the key information about the crime.

Defendants make numerous arguments about the validity of Erickson's statements and how the information supplied by Erickson and the officers' actions in accumulating the information was acceptable. The Court acknowledges that in many instances the inconsistencies between Erickson's testimony and the facts can be explained away by theorizing alternate scenarios where Erickson's version of the facts comports with the evidence found at the scene. However, in a § 1983 action, "'[a]s with any summary

43

judgment motion, we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation.'" *Livers v. Schenck*, 700 F.3d 340, 350 (8th Cir. 2012) (quoting *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)). The substance of Officer Short's interview of Erickson allows for the reasonable inference that the 44 leading questions asked by Officer Short and other demonstrably incorrect statements made by Erickson regarding the evidence found at the murder scene combined to constitute proof of fabrication of evidence. [Ex. II (Doc. 215-1)]. The question before the Court is not whether each individual allegation against the Defendant Officers can be explained away by the defendants, but whether the evidence as a whole could be sufficient for a fact finder to conclude that the Defendant Officers engaged in conscious-shocking behavior and deliberately fabricated evidence that was presented to convict Ferguson. *See Moran v. Clark*, 296 F.3d 638, 643 (8th Cir. 2002); *see also Livers v. Schenck*, 700 F.3d 340, 354 (8th Cir. 2012) ("State officials may not cherry-pick cases that address individual potentially coercive tactics, isolated from one another, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will." (quotation omitted)). As Ferguson has presented evidence that could be determined by a jury to warrant a Plaintiff's verdict in this case, Defendants are not entitled to summary judgment with respect to Erickson's testimony.

### 2. Reports of Interviews of Mallory, Arthur, and Walker

#### a. Mallory Statements

The record contains two versions of Report 243, a report documenting the content of Defendant Westbrook's interview with Dallas Mallory. [Ex. WW (Doc. 221-3); Ex.

44

XX (Doc. 221-5)]. According to Ferguson, the report was altered to insert the following

paragraph into what is now Exhibit WW:

> We talked further, and Detective Harmon showed MALLORY a
> picture of ERIC speaking with ERICKSON on Halloween night
> 2001. MALLORY told me he had been dr rm al day. He explained
> he worked at FORUM DRY CLEANERS, and he wore the unifo the
> Blue note later that evening. He said he had been drinking that
> night, and N that evening. He said he could not remember the
> location of that contact, but and worked up. MALLORY said
> ERICKSON told him he had "beat someone down." He s thing in
> his hand, but he could not recall what. I inquired as to whether he ha
> d he stated he could not recall.

[Ex. WW, at FERGUSON00135 (Doc. 221-3, p. 2)]. This paragraph is not included in

Exhibit XX. Ferguson argues that it is clear that the report was fabricated because the

signature page of the original report was removed and attached to the fabricated report,

which resulted in incorrect page numbering in the fabricated report. Defendant

Westbrook argues that the duplicate reports were a result of a computer glitch. It is not

apparent from the record which contention is correct.

Defendants argue that even if the statement was fabricated, the alleged fabrication

did not convince Erickson to confess plead guilty, as Erickson only saw the report after

he had already admitted numerous times that he was involved in the Heitholt murder and

named Ferguson as his accomplice multiple times. Defendants further contend that

Erickson's decision to inform the officers that he had spoken to Mallory about the murder

meant that Erickson did not rely on the report in making the confession.

Whether Erickson would have acted differently had he been presented with

Exhibit XX rather than Exhibit WW is a question of fact appropriate for a jury. Exhibit

XX contains only equivocal statements like "I asked him if he had seen either ERICKSON or FERGUSON that night, and he stated he could not remember," "I advised MALLORY we had information he had in fact spoke with one of the suspects, ERICKSON or FERGUSON on the night of the homicide.. MALLORY stated he did not believe he did so, and he would be willing to take a voice stress analysis examination to prove to investigators that he did not talk to either," and "We talked further, and Detective Harmon showed MALLORY a picture of ERICKSON. MALLORY then advised he did seem to remember speaking with ERICKSON on Halloween night 2001." [Ex. XX, at FERGUSON00139 (Doc. 221-5, p. 2)]. These statements are a far cry from the specific allegations that appear in Exhibit WW.

As Defendants note, Erickson brought Mallory to the attention of the Defendant Officers and informed the officers that he told Mallory that he and Ferguson had been involved in the murder. However, the circumstances surrounding Erickson's initial interviews on March 10, 2004 are contested by the parties. Erickson underwent two interviews on March 10. The first was not recorded. In the second recorded interview, Detective Short asked Erickson a slew of leading questions. Furthermore, Erickson indicated at multiple points during the recorded interview that he was unsure of what had happened:

> Q: So it's possible Ryan could have strangled this guy with his belt, got the keys, and you not know about it?
> A: The guy – The man's belt?
> Q: Yeah.
> A: His own belt?
> Q: Yes. Does this ring a bell?
> A: Not at all. Like –

46

Q:  But you saw Ryan strangle him though?

A:  I thought I did.

Q:  Yeah. Okay. All right.

A:  I mean, I might not even know what I'm talking about now.

Q:  Well, like I said, you've told us something only people (inaudible) would know, so that's not even a question.

A:  What did I – Like, what?

Q:  Again, playing poker. I mean, you remember what you told me. You remember what's going on.

A:  Yeah.

[Ex. II, at p. 23 (Doc. 215-1, p. 7)].

A:  I mean, for all I know, I could have just flipped out, man. I don't know.

Q:  Well, before you say that, listen to me. We got a Crime Stoppers report that sits there and tells us that you made comments – or not comments – that you made the statement – Crime Stoppers report said that you said to Ryan at a party on New Year's Eve that "We killed that guy." . . . So I know that you know what you're talking about.

    Secondly, Nick walks in here today and says, "Chuck told me he did it." So it's not a matter of flipping out and "I don't know what's going on." We know you know what's going on. Maybe you forgot some of it, but you didn't forget all that you're telling me.

    . . . There is no way in hell that you hit this guy once, turned around, and got sick. If you only hit him once, turned and ran away and got sick, you had to hand the thing off to Ryan, because this guy's got head wounds all over his head. We're talking minimum fifteen strikes.

A:  I must have done it then. I mean –

Q:  Okay.

A:  Either that, or I stopped and he did. I don't know.

*Id.* at 25-27. Given Erickson's apparent confusion about the extent of his involvement in

the Heitholt murder, it is unclear what effect Mallory's statements in Exhibit XX would

47

have had on Erickson's belief that he was involved in the crime if not accompanied by the allegedly fabricated paragraph that appears in Exhibit WW. Furthermore, Erickson stated in a 2011 affidavit that "[s]oon after my arrest I was given my discovery. I was given statements by Dallas Mallory, Jerry Trump and Meghan Arthur. Those statements led me to believe that I was guilty." [Ex. BBB (Doc. 211-3)].

The Court cannot say based on the evidence before it whether (1) Exhibit WW was fabricated, and (2) whether any fabrication infringed on Ferguson's liberty interest by influencing Erickson's testimony against him. *See Winslow v. Smith*, 696 F.3d 716, 582 (8th Cir. 2012). These are questions appropriate for a jury.[6]

### b. Arthur Statements

Ferguson also contends that Defendant Stroer fabricated evidence in the report she prepared following her March 11, 2004 interview with Meghan Arthur. Defendants argue that any inaccuracies were reasonable based on the information provided by Arthur and that Arthur's primary objection to the content of the report was that it was "dramatized." Defendants also contend that as Arthur did not testify at Ferguson's

---

[6] Defendants also argue that there can be no infringement on Ferguson's rights as a result of the Mallory testimony because Ferguson's counsel was aware of both of the statements at the time of trial and they were never used in the criminal trial, they cannot violate his due process rights. They also argue that this evidence was never used by Judge Crane in deciding to file charges against Ferguson, as Westbrook's interview of Mallory did not conclude until 2:50 p.m. on March 10, 2004, and Judge Crane filed the Complaint before 1:09 p.m. on March 10. Because it is possible that the evidence was fabricated and influenced Erickson's testimony at Ferguson's trial, however, the Mallory statement presents an issue for trial even if it did not otherwise influence the validity of Ferguson's conviction.

48

criminal trial and the prosecutor did not rely on Arthur's statement in preparing the Complaint, there was no harm caused by any fabricated statement.

Arthur has claimed at multiple points that there are inaccuracies in Report 252, prepared by Stroer, including notes that Arthur thought Ferguson took cocaine the night she heard him talking at a party and notes that made it sound as though Arthur knew what Ferguson had been discussing that night. According to Arthur, her comments were largely speculation and she did not know what Ferguson had been talking about, though she thought it might have been drugs. In her 2015 deposition, Arthur commented that the report contained "a lot of speculation and things that I just didn't say." [Ex. Q, at p. 26 (Doc. 218-6, p. 7)].

Ferguson has cited sufficient questions about the accuracy of the record to create a genuine issue of material fact as to whether Defendant Stroer fabricated evidence in her report regarding Arthur's statement and whether Erickson relied on any fabrication in testifying against Ferguson. Defendants argue that all of the alleged false facts were reiterated by Arthur at various later points in the investigation. While Arthur reiterated some of the facts at later points in the investigation, her concessions to the facts set out in Stroer's report appear to have been largely premised on the timing of later depositions and her inability to remember anything different. [*See* Ex. P, at FERGUSON006785-86 (Doc. 218-4, p. 48-49) ("I don't remember. I mean, I know – I'm not like the typical person you're dealing with right now. My – I'm like – I can't remember things that happened like six months ago. I mean, that's kind of what happens to your brain when you have a baby, like I'm in a very foggy point. . . . I'm like – my memory is not – it

49

might solidify, you know, in a couple of years, but I know that this is like – this might not be the best time to be asking me about a lot of this and I'm going to tell you I don't remember.")].  Her failure to contest the 2004 report at this earlier date therefore is not clear evidence that the report was accurate.

For the first time in their reply brief, Defendants also contend that Arthur should not be permitted to create credibility issues with her prior testimony by testifying differently now.  In support of their argument, Defendants cite *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983).  *Camfield* addressed whether conflicting statements between an affidavit produced with a summary judgment motion and prior deposition testimony by the affiant were sufficient to create a genuine issue of material fact.  *Id.* at 1364.  The Eighth Circuit held that the affidavit did not create a genuine issue of material fact "because the circumstances in this case do not suggest legitimate reasons for Camfield's filing of the inconsistent affidavit."  *Id.* at 1365.  The court went on to explain that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.*

Unlike the situation in *Camfield*, Arthur is not attempting to contradict earlier deposition testimony with a new affidavit being presented in conjunction with the motion for summary judgment.  Here, the allegation is that the report of Arthur's 2004 statement to Officer Stroer was fabricated.  While Arthur failed to contest some of the statements present in the 2004 report in a 2012 deposition taken in conjunction with Ferguson's

50

habeas petition, she has since raised issues with the substance of the 2004 report. She was deposed in this case and consistently stated that the contents of the 2004 report were fabricated. This is a far different situation from that in *Camfield* where the party who had deposed the witness was later blindsided by contradictory statements in an affidavit without a chance to explore the discrepancy. Defendants had a full and fair opportunity to depose Arthur about the differences in the 2004 report, her 2012 deposition, and her deposition testimony in this case. Arthur's allegations regarding inaccuracies in the 2004 report may be considered without violating the principles set forth in *Camfield*.

Whether the 2004 report was fabricated constitutes a factual dispute which must be addressed at trial. It is also unclear from the record what affect any fabrication may have had on Erickson and his testimony against Ferguson. Arthur was questioned by Stroer and the report was prepared one day after Erickson was questioned by the officers. The proximity of this report to Erickson's confession, which contained the above discussed caveats and statements regarding Erickson's confusion and reliance on Arthur's statement suggest that any fabricated evidence could have affected Erickson's conduct in pleading guilty and testifying against Ferguson.

### c. Richard Walker Interviews

Ferguson also argues that the Defendant Officers fabricated Richard Walker's statements. Walker spoke with the officers twice in 2004: once with Detective Stroer in April 2004, and again with Detective Liebhart in September 2004, stating both times that he had received information from Ferguson about the Heitholt murder while they were incarcerated together in the Boone County Jail. Walker told the detectives that Ferguson

51

had described to him how he murdered Heitholt. In January 2005, Jim Miller interviewed Walker and when asked about whether he thought what he told the police in September 2004 was the truth, Walker replied "I'd say probably part of it was and probably part of it wasn't …" [Ex. TT, at p. 2 (Doc. 220-5, p. 2)]. He went on to say "If anything, the only thing I remember him saying is that, uh, that he was not guilty and that, that friend of his was just ate up on drugs or whatever and was trying to set him up and to frame him. He didn't even, didn't even know that, what he was doing, because it didn't make no sense." *Id.* at 6.

Sometime after Walker was in Ferguson's cell block, he was moved to Erickson's cell block. Erickson stated the following in a 2011 affidavit:

> Something that helped convince me to take a deal was Richard Walker's statement. Richard Walker was in Ryan's cell block first. Then later Walker was in my cellblock. Walker told me that Ryan "was going to do what he had to do to get out of it." Walker told me that Ryan had told him that he dropped me off and I killed Heitholt alone. Then when Ryan got there after parking his car, Heitholt was already dead.

[Ex. BBB, at OFFICERS001584 (Doc. 211-3, p. 17)].

While Erickson may have relied in part on Walker's statement in deciding to plead guilty or testify against Ferguson, Ferguson has presented no evidence or argument to support his contention that the Defendant Officers fabricated Walker's statements. When interviewed by Miller about the content of the 2004 reports, Walker never suggested that the officers fabricated any of the evidence in the reports. [Ex. TT (Doc. 220-5)]. Walker stated that he was not even sure whether Ferguson was innocent or guilty: "I can't say

Case 2:14-cv-04062-NKL   Document 272   Filed 08/14/15   Page 52 of 62

he's innocent or guilty, but like I told you, in my heart, I feel like he was innocent." *Id.*

at 7. Walker also conceded that he may have intentionally lied to the police:

> JM: Did you intentionally just lie with, to the police?
> RW: Did I intentionally lie to the police?
> JM: About some of this stuff? For whatever reason, just as a joke, or as whatever . . .
> . . .
> RW: If I did, it was to help Ryan.

*Id.* at 9-10. These statements do not support Ferguson's contention that the officers were responsible for any inaccuracies in the reports documenting Walker's statements.

Ferguson notes that in a 2015 deposition, Detective Liebhart testified that "[Walker's] history would make one believe he's not credible. And then his final interview to me at the Fulton Reception and Diagnostic Center removed all doubt that he had any court credibility." [Ex. DD, at p. 54 (Doc. 212-1, p. 54)]. However, the officers' decision not to share with Erickson that they had doubts regarding Walker's credibility does not equate fabrication of evidence. Moreover, while Ferguson notes that Erickson was in possession of the police reports documenting both the April and September 2004 Walker interviews at the time he decided to plead guilty, Ferguson does not cite anything in the record suggesting that Erickson relied on those statements. Instead, they cite Erickson's note in a 2011 affidavit that he had conversations with Walker that influenced his decision to plead guilty. [Ex. BBB, at OFFICERS001584 (Doc. 211-3, p. 17)]. As there is no evidence that any of the officers coerced Walker into making statements about Ferguson or Erickson's involvement in the murder, no evidence that they fabricated any of the information contained in the Walker reports, and no evidence that they promised

53

Walker anything in return for making a statement about the murder, the Walker evidence alone is insufficient to prove Ferguson's due process claim in Count II.

### C. Count III – Substantive Due Process: Reckless Investigation

Ferguson argues that Defendant Officers violated his due process rights by recklessly investigating the case. In order to succeed on a constitutional claim based on reckless investigation, the plaintiff must be able to show that the officer's "failure to investigate was intentional or reckless," and was shocking to the conscience. *Cooper v. Martin*, 634 F.3d 477, 481 (8th Cir. 2011). Evidence that is shocking to the conscience includes "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [and] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009). "Mere negligent failure to investigate does not violate substantive due process. Likewise, allegations of gross negligence do not give rise to a constitutional violation." *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008) (citations omitted). An officer's failure to follow up on additional leads would not constitute a substantive due process violation. *See id.*

Ferguson argues that the Defendant Officers' reckless investigation is apparent in the record from the officers' coaching of Erickson, Mallory, Arthur, and Walker, as well as their indoctrination of Erickson, statement to Erickson that he was on the "chopping block," decision to pursue prosecuting Ferguson and Erickson for the Heitholt murder despite their fingerprints not appearing at the scene, and decision to continue the

54

prosecution despite Ferguson and Erickson bearing no physical resemblance to the individuals described by Ornt and Trump. Ferguson also argues that the officers' failure to consider Boyd as a suspect was reckless, as he was the last person known to be with Heitholt, he had recently had an argument with Heitholt, and he gave inconsistent statements to the police.

As described in Part II, *supra*, Ferguson has alleged sufficient facts to create a submissible question regarding whether Defendants fabricated evidence that influenced the testimony against him at trial. If Ferguson succeeds on his fabrication claim, this would certainly constitute some "evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009). As Ferguson has presented some evidence which a jury could find to indicate that Defendants undertook a reckless investigation, Defendants are not entitled to summary judgment on this claim. The remainder of the facts alleged to constitute evidence of a reckless investigation, while likely insufficient independently to constitute evidence of recklessness, could bolster Ferguson's reckless investigation claim in combination with the fabrication evidence.[7]

In denying summary judgment on Count III, the Court finds the Eighth Circuit's opinion in *Wilson* instructive:

---

[7] Defendants argue that as the Complaint does not state which of the Defendant Officers allegedly committed which parts of their investigation recklessly, Ferguson's claim fails. However, Ferguson's Count V alleges that the Defendant Officers were engaged in a conspiracy. As such, it is not necessary that Ferguson specifically identify which officers committed each alleged act.

55

From this evidence, a factfinder could determine . . . that this was an aggressive but imperfect investigation where the officers had some basis to believe that Plaintiffs were guilty and, at most, the officers were negligent in putting together the evidence to inculpate Plaintiffs. But a factfinder could also determine that this was a reckless investigation where members of the sheriff's department forced vulnerable individuals into agreeing that they had a role in the Wilson murder and then coached these individuals into giving false testimony that fit into the sheriff department's own narrative of events while ignoring evidence contrary, and potentially fatal, to the department's theory.

Defendants may not be held liable merely for aggressively investigating the crime, believing witnesses, following leads, and discounting those pieces of evidence that do not fit with the evidence at the scene of the crime. In investigating a crime, it is unlikely that every witness's account will align perfectly with the testimony of every other witness. . . . However, Defendants may be held liable if they recklessly ignored evidence suggesting Plaintiffs' innocence or systematically pressured witnesses to manufacture false testimony to fill gaps in an investigation.

*Winslow v. Smith*, 696 F.3d 716, 733-34 (8th Cir. 2012). Ferguson has presented evidence that a jury could determine proved that the Defendant Officers pressured Erickson into agreeing that he played a role in the Heitholt murder and coached him to give false testimony against Ferguson either by supplying him facts about the murder during his interrogations or feeding him fabricated evidence to convince him to plead guilty. While a plaintiff's verdict on this claim is not a foregone conclusion based on the evidence presented by the parties in conjunction with the summary judgment motion, it is not the Court's job to determine the veracity of Ferguson's evidence at this juncture. As such, summary judgment is denied on Ferguson's Count III.

### D. Count IV – Malicious Prosecution

Case 2:14-cv-04062-NKL   Document 272   Filed 08/14/15   Page 56 of 62

Ferguson's Count IV alleges that Defendants maliciously prosecuted him for the Heitholt murder. A claim for malicious prosecution in Missouri requires proof of "(1) the commencement of a prosecution against the plaintiff; (2) instigation by the defendant; (3) termination of the proceeding in favor of the plaintiff; (4) the want of probable cause for the prosecution; (5) [that] the defendant's conduct was actuated by malice [;] and (6) that the plaintiff was damaged." *Cassady v. Dillard Dept. Stores*, 167 F.3d 1215, 1219 (8th Cir. 1999) (quoting *Bramon v. U-Haul, Inc.*, 945 S.W.2d 676, 684 (Mo. Ct. App. 1997)).

Defendants argue that they are entitled to summary judgment because Ferguson's grand jury indictment amounts to a prima facie showing that probable cause existed for the prosecution. Under Missouri law,

> If a charge is initiated by indictment by a grand jury . . . [this] amounts to a prima facie showing that probable cause did exist for the prosecution. *Moad v. Pioneer Finance Co.*, 496 S.W.2d 794, 798 (Mo. 1973); *Hamilton v. Krey Packing Co.*, 602 S.W.3d 879, 882 (Mo. App. 1980). The prima facie showing is conclusive unless rebutted by evidence that false testimony was the basis of the charge and the falsity was discoverable upon reasonable investigation. *Moad*, 496 S.W. 2d at 799; *Lipari v. Volume Shoe Corp.*, 664 S.W.2d 953, 954 (Mo. App. 1983); *Hamilton*, 602 S.W.2d at 882.

*Anton v. Police Retirement System of St. Louis*, 925 S.W.2d 900, 905 (Mo. Ct. App. 1996). Probable cause must exist to support the prosecution from the outset, as well as throughout the course of the prosecution.

Though Ferguson was indicted by a grand jury, he argues that the reports and observations given by Defendants to Judge Crane, the prosecutor, contained fabricated evidence. Judge Crane stated that in deciding to instigate the prosecution, he relied on the Probable Cause Statement which set out a brief set of facts from Defendants'

57

investigation. [Ex. 12, at p. 8-9 (Doc. 239, p. 9-10)]. Judge Crane may have also reviewed the videotaped interview of Erickson and Dallas Mallory's statements. *Id.* at 8-12. As the Court discussed *supra* at Part II.B.1.b, factual disputes exist as to whether Defendants intentionally manufactured false evidence that was a component of what Judge Crane reviewed in initiating the prosecution. If Ferguson were to prevail on his fabrication claim, he would be able to overcome the presumption afforded by the grand jury indictment. Defendants do not argue that independent probable cause existed to support the prosecution beyond the evidence Ferguson claims was fabricated. Absent argument to this effect, factual disputes exist which preclude the Court from determining at this juncture whether probable cause existed to support Ferguson's prosecution.[8]

Defendants further argue that they are entitled to official immunity for the discretionary functions performed in interviewing witnesses, writing reports, and submitting the reports to Judge Crane. However, officers are not entitled to official immunity for discretionary acts done in bad faith or with malice. *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. banc 1986). As discussed *supra*, Ferguson has presented sufficient evidence to create a genuine issue of material fact regarding Defendants' state of mind in compiling the case against Ferguson.

Lastly, Defendants contend that the prosecution was instigated by Judge Crane and not Defendants. "'To impose liability on a defendant for malicious prosecution,

---

[8] Defendants repeat arguments about the Missouri Court of Appeals' failure to conclude that there was a lack of probable cause to support Ferguson's prosecution. However, there is no need for any court to have concluded prior to this point that probable cause was lacking in order for Ferguson to maintain his claim. As Ferguson's conviction has been vacated, he may pursue his malicious prosecution claim.

defendant must advise, encourage, pressure, or cause the institution of the prosecution.'" *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 823 (8th Cir. 2010) (quoting *Schumer v. Craig Distrib. Co.*, 745 S.W.2d 163, 165 (Mo. Ct. App. 1987)); *see also Burnett v. Griffith*, 769 S.W.2d 780, 784 (Mo. banc 1989) ("Instigation requires proof that the defendant stimulated, promoted or encouraged the specific action taken."). While the Defendant Officers were not responsible for pursuing the prosecution of Ferguson in court, the notes from their investigation were undoubtedly instrumental in Judge Crane's prosecution of Ferguson. This support of the prosecution is sufficient for Ferguson to maintain his malicious prosecution claim against Defendants in relation to this element.

### E. Count V – Conspiracy

Ferguson's next count alleges that Defendant Officers were engaged in a conspiracy. In order to bring a successful claim for conspiracy, Ferguson must prove (1) that the Defendants conspired to deprive him of a constitutional right, (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy, and (3) that he was injured by the overt act. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Ferguson is also required to prove that he was deprived of a constitutional right or privilege. *Id.* As discussed above at length, Ferguson has presented sufficient evidence to create a question of fact as to whether Defendants violated his constitutional rights.

The only remaining question in relation to the conspiracy claim, then, is whether Ferguson has presented adequate evidence to suggest that a conspiracy existed. "In order to prove the existence of a conspiracy . . . [Ferguson] 'must allege with particularly and specifically demonstrate with material facts that the defendants reached an agreement.'"

59

*Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996) (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.3d 650, 652 (8th Cir. 1989)). However, "the elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only warranted when 'the evidence is so onesided as to leave no room for any reasonable difference of opinion as to how the case should be decided.'" *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 693 F.2d 733, 743 (8th Cir. 1982) (citations omitted).

Ferguson argues that there is ample evidence in the record to suggest that Defendants engaged in a conspiracy. During the investigation of the Heitholt murder, Sergeant Monticelli would hold meetings with the investigating officers where the investigation would be discussed and lead cards would be generated. [Ex. HH, at p. 110-14 (Doc. 214-4, at p. 110-14)]. Many of the investigating officers completed interviews in tandem. Ferguson argues that these interviews often utilized coercive tactics or resulted in fabricated reports. The record also reveals a pattern of officers interviewing suspects and failing to complete reports regarding the content of the interviews. *See Ferguson v. Dormire*, 413 S.W.3d 40, 67, 69 (Mo. Ct. App. 2013) (describing at least two instances where officers conducted interviews in the case without completing a corresponding report). While this evidence of conspiracy is circumstantial, it is sufficient to create a submissible question regarding whether Defendants engaged in a conspiracy to deprive Ferguson of his constitutional rights. Summary judgment is denied on Count V.

### F. Count VII – False Arrest

Finally, Ferguson argues that Defendant Officers falsely arrested him for the Heitholt murder. A false arrest occurs when there is confinement without legal justification. *Day v. Wells Fargo Guard Service Co.*, 711 S.W.2d 503, 504 (Mo. 1986); *Ivy v. Wal-Mart Stores, Inc.*, 777 S.W.2d 682, 683 (Mo. Ct. App. 1989). Ferguson contends that the probable cause for his arrest was fabricated. As noted above in Part II.D, there is a factual dispute as to whether the evidence used to constitute probable cause was fabricated. There are also factual disputes that exist as to the state of mind of the Defendants. As such, there can be no summary judgment awarded on this claim.

Defendants also argue that as Ferguson was arrested by the Kansas City Police Department, they cannot be liable for false arrest. However, "[l]iability attaches where it be shown that the defendant instigated, caused or procured the arrest." *Id.* at 684; *see also Rustici v. Weidemeyer*, 673 S.W.2d 762, 767 (Mo. banc 1984) ("A person may also be liable for false arrest if he does not actually confine the plaintiff but merely instigates it, as in the case of providing information on the basis of which a subsequent unlawful arrest is made."). Here, Defendant Officers informed the Kansas City Police Department that Ferguson needed to be arrested. As they helped cause the arrest, they are not insulated from a false arrest claim.

## III.    Conclusion

For the reasons set forth above, summary judgment is granted for Defendants on Ferguson's Count I and the Richard Walker evidence in Count II. Defendants' motion is denied on the remainder of Ferguson's claims. This order addresses only the parties'

arguments raised in the summary judgment motion and does not affect the overall

admissibility of evidence at trial, which may be relevant to multiple claims in the lawsuit.


                                            s/ Nanette K. Laughrey
                                            NANETTE K. LAUGHREY
                                            United States District Judge

Dated: August 14, 2015
Jefferson City, Missouri